68 P.3d 618

STATE of Hawai'i, Plaintiff–Appellant,

v.

Harvey ABABA, Defendant–Appellee,

and

Rodrigo Ababa, Defendant.

No. 24127.

Intermediate Court of Appeals of Hawai'i.

Nov. 29, 2002.

As Amended Dec. 4, 2002.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellant.

Edward K. Harada, Deputy Public Defender, on the briefs, for defendant-appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by FOLEY, J.

On January 5, 2000, Defendant–Appellee Harvey Ababa (Ababa) was charged by complaints filed in the District Court of the First Circuit, Honolulu Division, with Attempted Murder in the First Degree, Murder in the Second Degree, Attempted Murder in the Second Degree, and Place to Keep Pistol or Revolver. Orders of commitment to the Circuit Court of the First Circuit (circuit court) on all charges were filed on January 11, 2000, and Ababa was charged in the circuit court by complaint filed January 13, 2000, with the following:

Attempted Murder in the First Degree, in violation of Hawaii Revised Statutes (HRS) §§ 705–500 (1993),[1] 707–701(1)(a)

---

1. HRS § 705–500 (1993) states:

§ 705–500 Criminal attempt. (1) A person is guilty of an attempt to commit a crime if the person:

(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substan-

(2000),[2] and 706–656 (1993 & Supp.2001);[3] Murder in the Second Degree, in violation of HRS §§ 707–701.5 (1993)[4] and 706–656 (1993 & Supp.2001); ·

Attempted Murder in the Second Degree, in violation of HRS §§ 705–500 (1993), 707–701.5 (1993) and 706–656 (1993 & Supp.2001); and

tial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

2. HRS § 707–701(1)(a) (2000) provides in relevant part as follows:

§ 707–701 **Murder in the first degree.** (1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:

(a) More than one person in the same or separate incident[.]

. . . .

(2) Murder in the first degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

3. HRS § 706–656 (1993 & Supp.2001) provides:

§ 706–656 **Terms of imprisonment for first and second degree murder and attempted first and second degree murder.** (1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole.

As part of such sentence the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–.606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

(2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of·second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706–657, as part of that sentence, the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section

Place to Keep Pistol or Revolver, in violation of HRS § 134–6(c) and (e) (Supp. 2001).[5]

Plaintiff–Appellant State of Hawai'i (State) appeals from the February 6, 2001 "Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress

706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

4. HRS § 707–701.5 (1993) provides as follows:

§ 707–701.5 **Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

5. HRS § 134–6 (Supp.2001) provides, in relevant part, as follows:

§ 134–6 **Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.**

. . . .

(c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of.business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

. . . .

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

A conviction and sentence under subsection (a) or (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under subsection (a) or (b) may run concurrently or consecutively with the sentence for the separate felony.

Statements" (Order).[6] The State contends the circuit court erred in finding that Ababa's constitutional and statutory rights to counsel and against self-incrimination were violated, warranting suppression of Ababa's self-incriminating statement to police. We agree with the State and vacate the circuit court's February 6, 2001 Order.

## I. BACKGROUND

The charges against Ababa arose out of a shooting incident that occurred on December 31, 1999, in which one man died and another man was shot in the stomach. Ababa was identified by several persons as being involved in the incident.

At the May 15, 2000 hearing on Ababa's Motion to Suppress Statements, Detective Mark Wiese (Detective Wiese) testified that he was the lead detective in the murder investigation of the December 31, 1999 shooting incident. Ababa was arrested on January 3, 2000 at approximately 1:30 p.m. and arrived at the Honolulu Police Department (HPD) station at approximately 2:00 p.m. Based on HPD cellblock telephone logs, Detective Wiese testified that Ababa was given an opportunity to make a telephone call to a family member or an attorney at approximately 9:06 a.m. on January 4, 2000.

Detective Wiese testified that pursuant to their investigation, he and Detective Larry Tamashiro (Detective Tamashiro) (collectively "the Detectives") met with Ababa at a police cellblock interview room on January 4, 2000 at 9:30 a.m. to ask Ababa if he wanted to make a statement. Ababa chose not to make a statement and was returned to his cell approximately five minutes later. On cross-examination, the following testimony was elicited from Detective Wiese as to what occurred during the five minutes in the interview room:

[DEPUTY PUBLIC DEFENDER (DPD):] **Q** What was discussed at that point?

[DETECTIVE WIESE:] **A** Basically, we told him that, you know, he understood what he was arrested for and that if he was gonna to talk to us. He said no, he

wanted an attorney. I said fine, and I took him back out and then when they took him back to the cell, I signed him back out.

**Q** That was the extent of your conversation?

**A** Correct.

**Q** Did you, I guess, apprise him that he could talk to an attorney, or did he say that he wanted to talk to an attorney?

**A** I don't understand the question.

**Q** Did you inform 'um that he could at that point talk to an attorney if he wanted, or did he simply just say I want an attorney?

**A** Oh, no, my procedure is, I always tell 'um you can talk to an attorney or you can talk to me. If he wanted an attorney, then I can't talk to you, I have to take you back to the cellblock.

**Q** There's been reference to an HPD 81 form, did you go over that form with him in——

**A** Not at that time, no.

**THE COURT:** Wait till the question——

**THE WITNESS:** I'm sorry.

**THE COURT:** Go ahead, restate the question. These are key questions.

[DPD]: **Q** With respect to the HPD 81 form, Detective, in that first conversation with Harvey Ababa when you took 'um out at about 9:30 into another room, did you go over an HPD 81 form?

**A** No, I just asked him if he wanted to talk to me.

**Q** And that's when he simply said no, he wants to talk to an attorney?

**A** Yeah.

**Q** And there was nothing mentioned about a public defender at that point, was there?

**A** No.

**Q** And after he said that he wanted to talk to an attorney, what did you do?

**A** I put 'um back, took 'um back next door.

**Q** So, with respect to the HPD 81 form and the rights on that form, his rights

---

6. The Honorable Michael Town presided.

were not read to him by yourself at that point, correct?

**A** No.

**Q** When he asked to speak to an attorney, he didn't request any particular attorney?

**A** No.

**Q** He didn't mention anything about a public defender?

**A** No.

**Q** You mentioned that when a prisoner asks for an attorney, you will make an effort to get an attorney.

**A** If a prisoner asks me specifically to contact an attorney whether it be the Public Defender's Office or a specific attorney that's (indiscernible) to him, his family or something, I would make that effort, yes.

**Q** So, they have to give you a specific, either a name of an attorney or specifically mention a public defender for you to make that effort?

**A** If he told me that I need an attorney, will you call an attorney for me, I would do that, but Mr. Ababa didn't ask me that.

**Q** If he asked for a specific attorney, is it your testimony you would make that call?

**A** Oh, yes.

**Q** But you didn't make the call because he didn't ask for a specific attorney?

**A** He said I just wanna talk to a lawyer. He didn't make any specifics of whether, what kine'a lawyer, who he wanted to talk to.

**Q** Had he said a specific name of an attorney, you would have made the efforts to make a call?

**A** Yes, I would.

**Q** And had he specifically mentioned that he wanted to talk to somebody from the Public Defender's, would you have made the call?

**A** Yes, I would.

**Q** So, when a suspect actually requests an attorney, you will make an effort to get them an attorney if they are specific as to an attorney they want to talk to?

[DEPUTY PROSECUTING ATTORNEY]: You know, I'm gonna object to this line of questioning. Now, it's becoming if a suspect wants an attorney, you would get that specific attorney to him. I don't think that's Detective Wiese's obligation to get an attorney or a specific attorney for a suspect. And if the question is, will you call a specific attorney, objection, that's asked and asked [sic].

**THE COURT:** But I wanna know Detective Wiese's procedures, his own, as a professional and his office. So, I'm gonna respectfully overrule that objection. I'm interested in this line of questioning.

[DPD]: **Q** What are your procedures, Detective, when a suspect asks for a lawyer, to speak to a lawyer but does not give you a particular name of that lawyer?

**A** My procedure is this, counselor, if the defendant asks me would you contact an attorney for me, I will make my effort to contact an attorney. I'll ask him which attorney would you like. If he hasn't got one, then I'll say, well, we have a Public Defender's Office, you want me to call that person, and I would do that.

But in this case, Mr. Ababa didn't ask me to contact an attorney. All he said he wanted to talk to an attorney, period. Mr. Ababa had an opportunity to contact his own lawyer there in the cellblock if he wanted to, call the Public Defender's Office. It's not my job to go and find him a lawyer if he doesn't ask for one, to have me personally call one for him.

**Q** Well, he did tell you that he wanted a lawyer?

**A** He said he wanted to speak to an attorney, that's what he said.

**Q** And this is the conversation at around 9:30, correct?

**A** Yeah.

**Q** He wanted to speak to an attorney?

**A** That's correct.

. . . .

[DPD]: **Q** Now, you've called the Public Defender's Office many times when persons have requested attorneys, have you not?

A In the course of 13 years, yeah, I've called the Public Defender's Office as well as other private attorneys on occasions, yes.

Q And, in fact, there is a list for off-hours, as you mentioned, of public defender's [sic] for a detective like yourself to call when somebody requests one, right?

A That's correct.

Q And you've used that list before to contact attorneys?

A Yes, I have.

Q Now, January 4th about 9:30, that was a Tuesday, correct?

A That's right.

Q And you were aware that the Office of the Public Defender was open at that time?

A Yes.

Q And you have called the Office of the Public Defender before during office hours, right?

A That's correct.

Q But is it, I guess, your testimony here in this case, you did not make a call to the Public Defender's Office because he did not himself say that he wanted to speak to a public defender?

[DEPUTY PROSECUTING ATTOR-NEY]: Objection, your Honor, asked and answered numerous times.

THE COURT: Sustained.

[DEPUTY PROSECUTING ATTOR-NEY]: Thank you.

[DPD]: Q Between about 9:35 and a little before one o'clock, you did not make any efforts to get Harvey Ababa an attorney, correct?

A That's correct.

Q In other words, you didn't make a call to the Public Defender's Office, right?

A That's correct.

Q And you didn't make any call to any other private type of attorney, correct?

A That's correct.

Q You are familiar, I guess, with HRS 803-9, right?

A Somewhat, yes, sir.

Detective Wiese testified that at approximately 1:00 p.m., January 4, 2000, he was at the Kalihi substation when he was informed that Ababa had changed his mind and requested to talk with him. Detective Wiese went to the main police station, "brought [Ababa] out," confirmed that Ababa wanted to talk, and took Ababa's statement. Detective Tamashiro was also present at the time Ababa made his statement. At this second meeting with Ababa, Wiese used an HPD 81 form, "Warning Persons Being Interrogated of their Constitutional Rights" (HPD 81 form), which was admitted into evidence as State's Exhibit 4. Detective Wiese testified that he and Ababa spoke in English and Ababa appeared to understand everything Detective Wiese was saying. Detective Wiese did not pressure or threaten Ababa to make a statement nor make any promises of leniency to Ababa in exchange for his statement. Ababa voluntarily initialed each section of the HPD 81 form following Detective Wiese's explanations of each section. Ababa signed his name and wrote his address on the HPD 81 form and also wrote in the date and time when he signed the form. Detective Wiese testified that as a result of his warning Ababa of Ababa's constitutional rights, Ababa consented to give a videotaped statement.

Detective Wiese testified that at no time did he tell Ababa that Ababa could not contact an attorney, the Office of the Public Defender (PD's Office), or a member of his family. Detective Wiese testified that he played no role in deciding who Ababa could call or when Ababa could use the telephone. Detective Wiese explained that under cell-block telephone procedures, if a prisoner asks to use the telephone to call his attorney, the turnkey will go to his supervisor and notify the supervisor that a request has been made. Detective Wiese testified that "they will take that person out of the cellblock, take him to a phone that's not a pay phone, to a regular phone, and let him make that call."

Ababa testified that he was arrested at his apartment by HPD personnel on January 3, 2000 at approximately 1:30 p.m. Upon his arrest, Ababa was not informed of any constitutional rights. Ababa was taken to the

HPD cellblock where he was fingerprinted, photographed, and placed in a jail cell. Ababa was not informed of any constitutional rights before he was placed in the jail cell. From the time he was placed in the jail cell following his arrest until 9:30 a.m. the following morning, Ababa remained in the cell. On January 4, 2000, at 9:30 a.m., Ababa was removed from the cell and taken to a room to meet with the Detectives. Ababa further testified as follows:

[DEPUTY PUBLIC DEFENDER (DPD):] Q All right. What happened in that room?

A And they asked me questions or they told me that, oh, yeah, it's like you know you did it and all this stuff that, you know, was that they wanted me to tell them what happened.

Q Okay. Now who was saying "We know you did it."

A Detective Weiss [sic].

Q What other things were said to you?

A They told me that. Well, he said that they know that I did it and, you know, they want me to tell them what happened, asking me, you know, where's the gun, you know. You—like you and your cousin did it. We know. That's about it.

Q Is that all you recall?

A Yeah.

Q Okay. Were other things said you just can't recall?

A Um-hmm.

Q What were you saying when they were asking you these questions?

A And I told them—well, I didn't say nothing. I just said, like—like, I don't know. I didn't say nothing, but I just said I don't know.

Q So you weren't really giving them much of a response?

A Yeah.

[DEPUTY PROSECUTING ATTORNEY]: Objection to leading questions, Your Honor.

THE COURT: Sustained.

[DPD]: Okay.

THE COURT: And stricken.

[DPD]: Q Was this conversation between you and the detectives being tape recorded?

A No.

Q Did the detectives ever show you any type of a rights form, what's called an HPD 81 form then?

A No.

Q Okay. Did any of the detectives advise you of any constitutional rights at any point?

A No.

Q Did the issue of you wanting an attorney at any point come up?

A Yes.

Q How did that come up?

A They told me if I wanted an attorney and I said yes.

Q All right. Were you ever informed that if you don't have the funds for an attorney, one would be appointed for you?

A No.

Q So when you said yes, that you wanted an attorney, were you invoking your right to counsel at that point?

A Yes.

Q What did they say then after you did that?

A Nothing. They took me out—they took me out the room and they put me in a cellblock.

Q Back in the cell?

A Yeah.

Q Okay. Did you yourself mention any specific attorney?

A No.

Q Did you have an attorney?

A No.

Q At the time did you know the names of any attorneys in this state?

A No.

Q Did you ever speak to an attorney prior to your arrest that day?

A Um, no.

Q Now why did you want an attorney?

A 'Cause if I was gonna say something, I wanted him to come to tell me if I should

say something or give me advice, you know.

Q Okay. When you stated that you wanted an attorney, what did you think was going to happen?

A Um, I thought they was gonna give me an attorney when I said I wanted one.

Q Who did you think was going to get you an attorney?

A Um, the detective.

Q And why did you think they were going to get you an attorney?

A 'Cause I told them to and they— they asked me if I wanted to take them and I said, eh—I said yeah.

Q When you went back to your cell, what were you doing in the cell?

A Um, nothing. Just sitting. Waiting for my, um—the attorney.

Q Did you think the police were going to get you one or place you into contact with one?

A Yeah.

Q Why did you think that?

A 'Cause I told 'em. And they said that I wanted one and I said yeah.

Q Did you think an attorney was going to come to the station?

A Yes.

Q Could you afford any attorney at that time?

A No.

Q Did the detectives ever provide you a number for an attorney?

A No.

Q Did they provide you an [sic] number for the Public Defender's Office?

A No.

\* \* \*

Q Okay. Did you observe as the police going cell-by-cell asking inmates if they want to make calls?

A No.

Q Did you observe anybody making phone calls on demand; i.e., saying I want to call and then being able to make a call?

A No.

Q Did you yourself request to make any calls?

A No.

Q Were you informed that you could make a call?

A No.

Q Prior to your being taken into that room at about 9:30 did you make any calls?

A No.

Q Did you try to make any calls?

A No.

Q Ultimately did you make any phone calls when you were at the station?

A When I went up there I made a statement. That's when they gave me a phone call.

\* \* \*

Q Is that the only time you tried to make a call?

A Yes.

Q Could you see, I guess, a phone from your cell area?

A No.

Q Did you see any phone book anywhere?

A No.

Q Did you know the number of the Public Defender's Office?

A No.

\* \* \*

Q What were you thinking after this period of time and no attorney showed up?

A Well, they weren't gonna give me a lawyer, so I decided to talk to them.

Q Who wasn't going to give you a lawyer?

A What's that? The detectives.

Q Okay. At some point then you—as you testified, you approached an officer and said you wanted to make a statement; right?

A Yes.

Q Now at some point did you tell either one of the officers "Fuck the lawyer"?

A Yes.

Q Why did you say that?

A 'Cause the lawyer wasn't there.

Q If an attorney had come down during that period of time when you were taken back after requesting an attorney and then by the time you say "Fuck the lawyer," would you have said "Fuck the lawyer"?

A Oh, no, no.

Q Why not?

A Because if he were to come there, I would have talked to him. I wanted him to tell me, what, should I make—make—you know, say something or not.

The circuit court examined Ababa as follows:

[THE COURT]: Q Mr. Ababa, you asked for a lawyer about 9:30—is that right?—in the morning?

A What do you mean?

Q You—you—

A Is that the first—

Q Yeah, the first time you asked for a lawyer.

A Yes. Yes. Yes, Judge. Yes, Judge.

Q And in your mind you thought the police were going to call a lawyer or do you think you'd be given a phone where you could call the lawyer?

A Well, I thought they was gonna give me a lawyer 'cause they went ask me if I wanted a lawyer—

Q Okay.

A And I said yes.

Q And you said yes.

A Yes.

Q All right. Did anybody explain to you that they weren't going to call the lawyer but that you could call the lawyer on your own?

A No.

Q If you had been taken into a room with either a pay phone or a free phone—

A Um-hmm.

Q —and given a list, a public defender list, what would you have done?

A Well, I would call them.

Q Okay. And were you taken into a room and put by a phone and said go ahead, call a lawyer?

A No. No.

Q Never happened?

A No. Never happened.

Q Did anybody offer you that option?

A No.

Q Did you ask them when is my lawyer going to come?

A Oh, no. I just went—I just went straight to my cell.

\* \* \*

Q Okay. Did anything happen between the time you said you wanted a lawyer and when you said I want to talk?

A Um, no.

Honolulu Police Officer Chad Ashida (Officer Ashida) testified that he was assigned to the HPD cellblock as a turnkey on January 4, 2000 during "B" watch, between the hours of 5:30 a.m. and 2:15 p.m. Telephone logs admitted at trial as State's Exhibit 1 indicate at approximately 9:06 a.m. Ababa called a family member. The form indicated Ababa did not get through. Officer Ashida testified he did not inform Ababa that Ababa could call an attorney or a public defender or that Ababa had a right to a public defender. Officer Ashida did not give Ababa the number for the PD's Office.

Honolulu Police Officer Michael Thompson (Officer Thompson) testified that he was assigned to the HPD cellblock as a turnkey beginning at approximately 12:45 p.m. on January 4, 2000. Officer Thompson testified that prisoners are allowed to use the telephone to call family members, attorneys, or a public defender, and Ababa had an opportunity to make a telephone call while Officer Thompson was on duty. Officer Thompson never informed Ababa that Ababa could call an attorney or a public defender. Officer Thompson testified he did not give Ababa any public defender numbers because Ababa "didn't ask." The telephone number for the PD's Office is not next to the telephones nor posted anywhere.

The circuit court questioned Officer Thompson as follows:

THE COURT: Officer, is there a phone book by either of those phones so they can

figure out what the public defender's number is assuming it's during work hours?

THE WITNESS: Yes, sir.

THE COURT: They can look it up?

THE WITNESS: Yes, sir.

THE COURT: Do you help them look it up?

THE WITNESS: Yes, sir.

THE COURT: Cause I think the Public Defender's under, what, State of Hawaii, it's under, what, B & F, or just under Public Defender's? You don't know, [Deputy Public Defender]. I just don't know where to look?

[DPD]: I don't know, Judge.

THE COURT: Do you know?

THE WITNESS: I recall, I think it's under Public Defender's Office.

THE COURT: And I'm looking in here, on this log, most of these say F–M. I take it that's for family?

THE WITNESS: Yes, sir.

THE COURT: And F–R for friend?

THE WITNESS: Yes.

THE COURT: So seldom do people call attorneys?

THE WITNESS: Very seldom, sir.

THE COURT: And the phone books' [sic] by both pay phones and the direct line, is that right?

THE WITNESS: There's one phone book.

THE COURT: One phone book?

THE WITNESS: If they need the phone book, we offer the phone book to them.

THE COURT: I'm looking at exhibit 2 here at 1640 hours, it indicates Harvey Ababa called a number, it says F–M and it has your initials M–T?

THE WITNESS: Yes, sir.

THE COURT: And this line here means it went through?

THE WITNESS: Yes, sir, he made contact.

THE COURT: How do you know the numbers, does it show on a screen, or does he tell you?

THE WITNESS: No sir, he tells me who he's gonna call.

Officer Thompson testified that he does not inform any suspects whatsoever of the telephone number of the PD's Office. Officer Thompson stated that arrestees have one opportunity per each eight-hour shift to make a telephone call, so an arrestee could wait up to eight hours to talk with an attorney. There are no instructions from HPD that the telephone should promptly be made available to arrestees.

Officer Thompson testified he had never seen defense Exhibit A, which was a one-page letter dated March 21, 2000 from the PD's Office indicating the home telephone numbers for available public defenders for various weeks, nor had he ever seen a similar letter.

At approximately 1:45 p.m., Officer Thompson escorted Ababa to Detective Wiese and overheard Ababa say "fuck the lawyer, I going tell you everything that wen happen" to Detective Wiese.

Edward K. Harada (Harada) testified that as a Deputy Public Defender for the last sixteen years, he is familiar with the operations and day-to-day activities of the PD's Office. The PD's Office is open on weekdays from approximately 8:00 a.m. to 4:30 p.m., and it fields calls during these hours from HPD detectives when felony defendants request counsel. On average, the office receives one to two calls per day during business hours from either the HPD Criminal Investigations Division (CID) or Narcotics Vice. The office fields calls from detectives who are dealing with criminal suspects or from suspects who have been referred for consultation. If a detective called the office on behalf of a suspect, a suspect could be in telephone contact with a public defender anywhere from thirty seconds (while the telephone call was transferred to the suspect) to between five to ten minutes (if the suspect made a separate telephone call). The "typical advice" given to suspects over the telephone makes it clear that they are not required to make a statement, and usually Harada advises them not to make any statement. The public defenders are available also by telephone to provide answers regard-

ing the process, what to expect if the suspects are charged, "and so forth."

Harada testified that the PD's Office has an after hours procedure where a rotating list of available senior felony attorneys' home telephone numbers is provided to HPD and CID. The written list is accompanied with a message that the specified attorneys are on call, available any time of the day (other than regular office hours), and can be reached for emergency telephone calls and "in particular to consult with suspects who may wish to speak to an attorney." This list is for HPD personnel to contact the public defenders at their home telephone numbers and is not intended to be given to suspects.

In its February 6, 2001 Order granting the motion to suppress, the circuit court made the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. On Monday, January 3, 2000, at approximately 1:30 p.m., Defendant Harvey Ababa was arrested in connection with a shooting incident which occurred on December 31, 1999. Mr. Ababa was transported to the Honolulu Police Department (HPD) station where he arrived shortly after 2:00 p.m. After he was booked, he was placed in a jail cell.

2. On Tuesday, January 4, 2000, at approximately 9:30 a.m., Mr. Ababa was removed from his jail cell and taken into an interview room. HPD detectives Mark Weise [sic] and Larry Tamashiro were present in the interview room.

3. The conversation was not taped and an HPD–81 adult rights form was not proffered to Mr. Ababa. Mr. Ababa invoked his constitutional right to counsel and was returned to his jail cell within five minutes.

4. Mr. Ababa desired counsel in order to advise him as to the propriety of proffering a statement. If he decided to make a statement after consulting with an attorney, Mr. Ababa was also interested in having the attorney assist him during the interrogation.

5. Mr. Ababa could not afford an attorney. He was not informed that if he could not afford an attorney, one would nevertheless be appointed for him.

6. While in his cell, Mr. Ababa waited for an attorney, as he believed that the police would undertake efforts to provide him with representation.

7. The detectives did not inform Mr. Ababa that he could call an attorney. He was not placed by a phone and instructed to contact an attorney.

8. Mr. Ababa did not make any request to call an attorney. He did not know any attorney.

9. Mr. Ababa was not provided with a number for the Office of the Public Defender. The number is not posted by any phone in the cellblock area of the police station.

10. Attorneys from the Office of the Public Defender field calls daily from HPD detectives, or suspects themselves, when there is an invocation of the right to counsel. The calls occur both during business hours, as well as after hours. A list of the personal phone numbers of deputy public defenders is available to HPD personnel so that an attorney can be contacted when an individual exercises his or her right to counsel during non-business hours.

11. Detective Weise [sic] has regularly contacted the Office of the Public Defender, as well as specified private attorneys, when explicitly requested to do so by suspects who invoke their right to counsel. Detective Weise [sic] did not make any efforts to contact an attorney for Mr. Ababa because Mr. Ababa did not request that he contact a specific attorney or request that the Office of the Public Defender be contacted.

12. Mr. Ababa exercised his right to counsel during the regular business hours of the Office of the Public Defender.

13. Neither detectives Weise [sic] or Tamashiro (nor any HPD officer) undertook any effort to effect Mr. Ababa's assertion of his constitutional right to counsel.

14. At approximately 12:55 p.m., Mr. Ababa indicated that he wanted to speak to a detective. He had anticipated consulting with an attorney, but felt that a long

period of time had elapsed and that he was not going to be provided counsel.

15. While being escorted to the interview room, Mr. Ababa exclaimed, "Fuck the lawyer," because an attorney had not yet come to the station.

16. Mr. Ababa filled out an HPD–81 police form wherein he signed his name indicating that he wished to waive his right to counsel.

17. Mr. Ababa was then interrogated by the detectives from 2:06 p.m. to 3:07 p.m. The interrogation was recorded. Mr. Ababa stated that he wished to waive his right to counsel.

### CONCLUSIONS OF LAW

1. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court ruled that the fifth amendment to the United States Constitution provides certain procedural protections to accused persons in order to safeguard the privilege against self-incrimination. *Id.* at 478, 86 S.Ct. 1602. The Court concluded that an individual has a fifth amendment right to counsel. *Id.* at 473–474, 86 S.Ct. 1602.

2. Article I, section 10 of the Hawai'i Constitution is Hawai'i's parallel provision to the fifth amendment and encompasses the protections enumerated in *Miranda*. *State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971).

3. HRS § 803–9 serves to protect the right to counsel where a suspect invokes this fundamental right. HRS § 803–9(2) creates a statutory duty requiring law enforcement to "make a reasonable effort" to provide the means for the defendant, upon request, to contact an attorney. This Court interprets the statute, at a minimum, to include the prompt provision of a telephone and current telephone number of the Office of the Public Defender. In addition, HRS § 803–9(4) prohibits law enforcement from questioning a defendant until he or she has had a "fair opportunity" to consult with an attorney.

4. On January 4, 2000, at approximately 9:30 a.m., Mr. Ababa unequivocally invoked his constitutional right to counsel. For an indigent defendant's invocation of the right to counsel to be meaningful, it must not be ignored or go unheeded. The Court concludes that Mr. Ababa did not have a fair opportunity to consult with an attorney. HPD personnel did not undertake any effort to effect Mr. Ababa's assertion of his constitutional right to counsel, and Mr. Ababa was not promptly provided with a telephone and current telephone number of the Office of the Public Defender. Meaningful information relating to the right to counsel is constitutionally required in the opinion of this Court and is supported by the ABA Standards for Criminal Justice 4–2.1, 5–6.1, and 5–8.1 (3rd ed.1993). *See also, State v. Kaeka*, 3 Haw.App. 444, 653 P.2d 96 (1982) and *State v. Kirkpatrick*, 89 Wash.App. 407, 948 P.2d 882 (1997).

5. While it is an open question nationally whether the law enforcement authorities themselves have a duty to notify the Office of the Public Defender upon the assertion of an indigent defendant's right to counsel (see ABA Std. 5–6.1 which states, in part "... The authorities should promptly notify the defender .... whenever the person in custody requests counsel ..."), for the constitutional right to counsel to be effective, prompt access to a telephone and a current telephone number of the Office of the Public Defender is essential.

6. Both statutorily and constitutionally, HPD law enforcement officers were under an obligation to give fair and meaningful effect to Mr. Ababa's invocation of his constitutional right to counsel. Based on the totality of the circumstances, it is the Court's opinion that they did not do so, and therefore, Mr. Ababa's statements must be suppressed.

On appeal, the State challenges Findings of Fact 4, 5, 6, 7, 9, 10, 11, 13, and 14 and Conclusions of Law 3, 4, 5, and 6.

## II. STANDARDS OF REVIEW

■ "We review a ruling on a motion to suppress *de novo* in order to determine whether it was right or wrong as a matter of law." *State v. Ramos*, 93 Hawai'i 502, 507, 6 P.3d 374, 379 (App.2000).

■ "The proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his or her own rights were violated." *State v. Edwards*, 96 Hawai'i 224, 232, 30 P.3d 238, 246 (2001) (internal quotation marks, brackets, and ellipses omitted).

■ A trial court's findings of fact are reviewed under the "clearly erroneous" standard of review. *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994).

> A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) ( . . . internal quotation marks omitted). "The circuit court's conclusions of law are reviewed under the right/wrong standard." *State v. Pattioay*, 78 Hawai'i 455, 459, 896 P.2d 911, 915 (1995)[.]

*State v. Anderson*, 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997). "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned." *Dan*, 76 Hawai'i at 428, 879 P.2d at 533 (internal quotation marks omitted).

## III. DISCUSSION

### A. ABABA'S RIGHTS UNDER HRS § 803–9 WERE NOT VIOLATED.

Hawaii Revised Statutes § 803–9 (1993) provides:

> § 803–9 **Examination after arrest; rights of arrested person.** It shall be unlawful in any case of arrest for examination:
>
> (1) To deny to the person so arrested the right of seeing, at reasonable intervals and for a reasonable time at the place of the person's detention, counsel or a member of the arrested person's family;
>
> (2) To unreasonably refuse or fail to make a reasonable effort, *where the arrested person so requests* and prepays the cost of the message, to send a telephone, cable, or wireless message through a police officer or another than the arrested person to the counsel or member of the arrested person's family;
>
> (3) To deny to counsel (whether retained by the arrested person or a member of the arrested person's family) or to a member of the arrested person's family the right to see or otherwise communicate with the arrested person at the place of the arrested person's detention (A) at any time for a reasonable period for the first time after the arrest, and (B) thereafter at reasonable intervals and for a reasonable time;
>
> (4) In case the person arrested has requested that the person see an attorney or member of the person's family, to examine the person before the person has had a fair opportunity to see and consult with the attorney or member of the person's family;
>
> (5) To fail within forty-eight hours of the arrest of a person on suspicion of having committed a crime either to release or to charge the arrested person with a crime and take the arrested person before a qualified magistrate for examination.

(Emphasis added.)

■ Under HRS § 803–9(2), there is no duty on the part of the police to make a telephone call to an attorney for the arrested person unless and until the arrested person requests the call to be made. The circuit court's Finding of Fact No. 8 states: "Mr. Ababa did *not* make any request to call an attorney. He did not know any attorney." (Emphasis added.) This finding is not challenged on appeal and is supported by substantial evidence.

Hawaii Revised Statutes § 803–9(4) provides that when an arrested person requests to "see an attorney," the arrested person shall not be examined until the person "has had a fair opportunity to see and consult with the attorney." The examination of Ababa immediately ceased when he stated he want-

ed to talk to an attorney, and the examination did not begin again until Ababa stated he no longer wanted to see and consult with an attorney.

The Hawaii Supreme Court held in *Edwards* "that the police failed to make a reasonable effort to contact an attorney pursuant to Hawai'i Revised Statutes (HRS) § 803–9(2) (1993), *as requested* by Defendant–Appellant[.]" 96 Hawai'i at 226, 30 P.3d at 240 (emphasis added). There was no such request in this case.

■ The request to "see an attorney" under HRS § 803–9(4) is different than the request to the police to call an attorney under HRS § 803–9(2). The request of the arrested person to see an attorney requires any examination of the arrested person to immediately cease—as it did in this case.

■ Ababa's *desire* to have counsel advise him and his *belief* that the police would undertake efforts to provide him with an attorney did not trigger the duty of law enforcement to contact an attorney for Ababa under HRS § 803–9(2).

■ The circuit court interpreted HRS § 803–9(2) to require law enforcement at a minimum to promptly provide the telephone and current telephone number of the PD's Office to the arrested person. We do not read HRS § 803–9(2) to require this

unless the arrested person so *requests*. That is the plain language of the statute.

Our foremost obligation when interpreting a statute is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the *language contained in the statute itself.* We read statutory language in the context of the entire statute, and construe it in a manner consistent with its purpose.

*State v. Bautista,* 86 Hawai'i 207, 209, 948 P.2d 1048, 1050 (1997) (internal quotation marks and brackets omitted; emphasis added).

Hawaii Revised Statutes § 803–9 provides an arrested person a variety of rights relating to counsel. The person cannot be denied the right of seeing counsel at reasonable times. Counsel will be contacted as requested by the arrested person. Retained counsel cannot be denied access to the arrested person. The arrested person has a fair opportunity to see and consult an attorney, when so requested, prior to being examined by law enforcement. The arrested person must be released or charged with a crime and taken "before a qualified magistrate for examination."

■ It is not until the arrested person is charged and appears in court without counsel that there is a duty to refer the person to the PD's Office,. and that duty belongs to the presiding judge, not law enforcement. HRS §§ 802–1 to 802–4 (1993).[7]

7. HRS §§ 802–1 through 802–4 (1993) provide:
§ 802–1 **Right to representation by public defender or other appointed counsel.** Any indigent person who is (1) arrested for, charged with or convicted of an offense or offenses punishable by confinement in jail or prison or for which such person may be or is subject to the provisions of chapter 571; or (2) threatened by confinement, against the indigent person's will, in any psychiatric or other mental institution or facility; or (3) the subject of a petition for involuntary outpatient treatment under chapter 334 shall be entitled to be represented by a public defender. If, however, conflicting interests exist, or if the public defender for any other reason is unable to act, or if the interests of justice require, the court may appoint other counsel.

The appearance of the public defender in all judicial proceedings shall be subject to court approval.

The appearance of a public defender in all hearings before the Hawaii paroling authority or other administrative body or agency shall be

subject to the approval of the chairperson of the Hawaii paroling authority or the administrative head of the body or agency involved.

§ 802–2 **Notification of right to representation.** In every criminal case or proceeding in which a person entitled by law to representation by counsel appears without counsel, the judge shall advise the person of the person's right to representation by counsel and also that if the person is financially unable to obtain counsel, the court may appoint one at the cost to the State.

§ 802–3 **Request for appointment of counsel.** Any person entitled to representation by a public defender or other appointed counsel may at any reasonable time request any judge to appoint counsel to represent the person.

§ 802–4 **Determination of indigency.** Unless otherwise ordered by the court, the determination of indigency shall be made by a public defender, subject to review by the court. Such determination shall be based upon an appropriate inquiry into the financial circumstances of

Whether the person is entitled to be represented by the PD's Office is determined by that office, not law enforcement. HRS § 802–4. The plain language of HRS § 803–9, especially when read with HRS §§ 802–1 to 802–4, does not require law enforcement to contact the PD's Office for an arrested person unless and until the person requests the contact be made. "Laws in pari materia, or upon the same subject, must be construed with reference to each other." *State v. Murray*, 63 Haw. 12, 23, 621 P.2d 334, 341 (1980). No such request was made in this case. The circuit court erred in concluding that the HPD officers were duty-bound under HRS § 803–9(2) to contact the PD's Office on Ababa's behalf, even though Ababa had made no such request.

 The circuit court's conclusion that Ababa's right under HRS § 803–9(4) to have "a fair opportunity" to consult with an attorney was violated was also in error because that conclusion was based on the circuit court's interpretation of HRS § 803–9 that the police had a duty to refer Ababa to the PD's Office once Ababa stated he wanted to see an attorney. Additionally, Ababa was given the opportunity to use the telephone and did make one call. He did not ask to use the telephone after that call.

When Ababa asserted his right to see and consult an attorney, the police examination of Ababa ceased and he was returned to his cell. A little more than three hours later Ababa stated he no longer wanted to see an attorney and stated he was waiving his right to counsel. It was only then that examination proceeded and Ababa gave the statements the circuit court suppressed. The only reasons given by Ababa for changing his mind were that he thought he was going to be provided with counsel and he felt a long period of time had elapsed (a little more than three hours). There is no claim that his waiver of counsel was the result of any conduct of the HPD officers other than failing to contact the PD's Office on Ababa's behalf.

the person seeking legal representation and an affidavit or a certificate signed by such person demonstrating the person's financial inability to obtain legal counsel. A person shall waive the

 A stated purpose of HRS § 803–9(2) and (4) includes "safeguarding, as nearly as may be, the right of persons arrested and detained merely for examination, a process which has, in the past, been grossly abused, and clarifying the rights of the person arrested for examination and of his or her family and counsel." *Edwards*, 96 Hawai'i at 233, 30 P.3d at 247 (brackets omitted) (quoting Sen. Stand. Comm. Rep. No. 440, in 1941 Senate Journal, at 1086 & Hse. Stand. Comm. Rep. No. 324, in 1941 House Journal, at 1249). There is no evidence of abuse in this case or that Ababa was being detained merely for examination. There is no finding or conclusion of the circuit court that Ababa waived his right to counsel for any reason other than his impatience at not being provided an attorney within three hours after his request to see an attorney.

## B. ABABA'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED.

### 1. Right to Counsel

 Ababa's right to counsel under the United States and Hawai'i Constitutions was not violated because he had not been charged with any crime when he gave his statement.

An individual has a right to counsel under the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i State Constitution which guarantees an accused the right to assistance of counsel for his or her defense. However, *this right attaches* at critical stages of the criminal prosecution, *only at or after the initiation of adversarial judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment.*

*State v. Luton*, 83 Hawai'i 443, 448, 927 P.2d 844, 849 (1996) (internal quotation marks, brackets, and footnotes omitted; emphasis added).

person's right to counsel by refusing to furnish any information pertinent to the determination of indigency.

### 2. Right Against Self–Incrimination

 Additionally, Ababa's right not to be compelled in any criminal case to be a witness against himself was not violated by HPD.

Under the fifth amendment to the United States Constitution and article 1, section 10 of the Hawai'i Constitution, no person shall be compelled in any criminal case to be a witness against himself or herself. When a confession or inculpatory statement is obtained in violation of either of these provisions, the prosecution will not be permitted to use it to secure a defendant's criminal conviction.

The privilege against self-incrimination is fundamental to our system of constitutional rule. Inasmuch as the privilege is jeopardized when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and subjected to questioning, procedural safeguards must be employed to protect the privilege whenever interrogation in a custodial setting occurs.

*Miranda[v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] imposed upon the prosecution the burden of demonstrating in any given case that these procedural safeguards had been employed and described them in relevant part as follows: Prior to any custodial questioning, the defendant must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

We noted in *[State v.] Nelson* [, 69 Haw. 461, 748 P.2d 365 (1987),] that the protections which the United States Supreme Court enumerated in *Miranda* have an independent source in the Hawai'i Constitution's privilege against self-incrimination. In determining the admissibility of custodial statements, the prosecutor must show that each accused was warned that he had a right to remain silent, that anything said could be used against him, that he had a right to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him. If these minimal safeguards are not satisfied, then statements made by the accused may not be used either as direct evidence or to impeach the defendant's credibility.

Assuming, however, that the minimal safeguards are observed, the accused may waive the right to counsel, provided that such waiver is voluntarily and intelligently undertaken. Nevertheless, we emphasize that waiver of the right to counsel during police interrogation is not irrevocable; in accordance with the mandate of *Miranda*, the right to counsel may be invoked at any point, and when invoked, all substantive questioning must cease unless and until counsel is provided.

*State v. Carvalho*, 101 Hawai'i 97, 105–06, 63 P.3d 405, 413–14 (Haw.App.2002).

 Whether Ababa's right against self-incrimination was violated

requires a twofold analysis: (1) whether [the defendant] was informed of his fifth amendment rights within the context of custodial interrogations; and, if so, (2) whether [the defendant] invoked or waived these rights.

*Luton*, 83 Hawai'i at 452, 927 P.2d at 853.

 Ababa was informed of his fifth amendment rights (HPD 81 form) immediately prior to the examination in which he gave the subsequently suppressed statements. This is not disputed. Ababa was informed that he had a right to remain silent, did not have to say anything, or answer any questions; anything he said might be used against him at his trial; he had the right to

have an attorney present and if he could not afford an attorney, the court would appoint one for him prior to any questioning; and if he decided to answer questions without an attorney being present, he still had the right to stop answering at any time. Ababa answered that he understood, did not want an attorney at that time, and would like to tell what happened. Ababa was properly informed of his *Miranda* rights against self-incrimination.

The second part of our analysis is whether Ababa invoked or waived these *Miranda* rights. Ababa expressly waived his right against self-incrimination and right to counsel prior to being examined and prior to giving the suppressed statements. His waiver was unambiguous and unequivocal. The record in this case demonstrates Ababa "voluntarily, knowingly, and intelligently" waived the presence of counsel. *State v. Hoey*, 77 Hawaiʻi 17, 36, 881 P.2d 504, 523 (1994). Ababa's initial invocation of his right to counsel a little more than three hours earlier does not negate his subsequent waiver of the same right.

> [O]nce an accused has expressed his desire to deal with police interrogators only through counsel, he cannot be further questioned until counsel has been made available to him, *unless* the accused initiates further communication, exchanges, or conversations with the police.

*State v. Mailo*, 69 Haw. 51, 53, 731 P.2d 1264, 1266 (1987). It was Ababa who initiated further conversations with police after he invoked his right to counsel, and, pursuant to those conversations and warnings, Ababa waived his rights to counsel and against self-incrimination. The circuit court erred when it concluded Ababa's constitutional rights to counsel and against self-incrimination were violated.

## IV. CONCLUSION

Accordingly, the circuit court's February 6, 2001, "Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress Statements" is vacated, and this case is remanded to the circuit court for further proceedings.