65 P.3d 156

**STATE of Hawai'i, Respondent/Plaintiff–Appellant,**

v.

**Harvey ABABA, Petitioner/Defendant–Appellee,**

and

**Rodrigo Ababa, Defendant.**

**No. 24127.**

Supreme Court of Hawai'i.

March 19, 2003.

---

Edward K. Harada, Deputy Public Defender, on the application for petitioner/defendant-appellee.

LEVINSON and ACOBA, JJ., and Circuit Judge HIFO, assigned by reason of vacancy; and NAKAYAMA, J., Dissenting, with whom MOON, C.J., joins.

Opinion of the Court by ACOBA, J.

Petitioner/Defendant–Appellee Harvey Ababa (Petitioner) was charged with having committed several felonies. Prior to trial, Petitioner filed a motion to suppress statements which sought to exclude from trial statements he made to the police on January 4, 2000. After a hearing, the first circuit court, the Honorable Michael A. Town presiding, granted Petitioner's motion and, on February 5, 2001, issued its findings of fact, conclusions of law, and order granting the motion to suppress statements (Order).

Respondent/Plaintiff–Appellant State of Hawai'i (the prosecution) appealed, and, on November 29, 2002, the Intermediate Court

of Appeals [1] (ICA) vacated the aforesaid order and remanded the case to the circuit court for further proceedings. *See State v. Ababa,* 101 Hawai'i 344, 361, 68 P.3d 618, 635 (Haw.Ct.App.2002). The ICA left the findings of fact undisturbed but ruled that the court's conclusions of law were in error. On December 30, 2002, Petitioner filed an application for a writ of certiorari asserting that "the ICA committed a grave error of fact or law in applying [Hawai'i Revised Statutes (HRS)] §§ 803–9(2) and 803–9(4) to the facts of this case[,] contrary to *State v. Edwards,* 96 Hawai'i 224, 30 P.3d 238 (2001), or otherwise erred, by ruling that Petitioner's statutory and constitutional rights were *not* violated[.]" (Emphasis in original.)

## I.

From the findings of fact, it is undisputed that on Monday, January 3, 2000, at approximately 1:30 p.m., Petitioner was arrested in connection with a shooting incident, which occurred on December 31, 1999. Petitioner was transported to the Honolulu Police Department (HPD) station where he arrived shortly after 2:00 p.m. After he was booked, he was placed in a jail cell. On Tuesday, January 4, 2000, at approximately 9:30 a.m., Petitioner was removed from his jail cell and taken into an interview room. HPD Detectives Mark Weise and Larry Tamashiro were present. The conversation among the persons present was not taped and an HPD 81 adult rights form was not proffered to Petitioner. Petitioner invoked his constitutional right to counsel and was returned to his jail cell within five minutes.

Subsequent to the five-minute interview, at approximately 12:55 p.m., Petitioner indicated that he wanted to speak to a detective. While being escorted to the interview room, Petitioner exclaimed, "Fuck the lawyer[.]" Petitioner subsequently completed an HPD–81 police form wherein he waived his right to counsel. Petitioner was then interrogated by the detectives from 2:06 p.m. to 3:07 p.m.

1. The Honorable Daniel R. Foley authored the opinion, joined by Chief Judge James S. Burns

This interrogation was recorded. In a motion to suppress filed on April 14, 2000, Petitioner sought to exclude his statements from use at trial on the ground that he had invoked his right to counsel during the five-minute interview.

## II.

In its decision, the ICA set out, *inter alia,* the testimony of Detective Weise concerning the five-minute interview. The testimony revealed that, in response to Detective Weise's statement that Petitioner could talk to the detectives or to an attorney, Petitioner indicated he wanted an attorney:

[DEFENSE COUNSEL]: Q What was discussed at that point?

[DETECTIVE WEISE]: A Basically, we told him that, you know, *he understood what he was arrested for and that if he was gonna talk to us. He said no, he wanted an attorney.* I said fine, and I took him back out and then when they took him back to the cell, I signed him back out.

Q That was the extent of your conversation?

A Correct.

Q Did you, I guess, apprise him that he could talk to an attorney, or did he say that he wanted to talk to an attorney?

A I don't understand the question.

Q Did you inform 'um that he could at that point talk to an attorney if he wanted, or did he simply just say I want an attorney?

A Oh, no, my procedure is, I always tell 'um *you can talk to an attorney or you can talk to me. If he wanted an attorney, then I can't talk to you, I have to take you back to the cellblock.*

. . . .

Q With respect to the HPD 81 form, Detective, in that first conversation with [Petitioner] when you took 'um out at about 9:30 into another room, did you go over an HPD 81 form?

and Associate Judge John S.W. Lim.

A *No, I just asked him if he wanted to talk to me.*

Q *And that's when he simply said no, he wants to talk to an attorney?*

A *Yeah.*

Q And there was nothing mentioned about a public defender at that point, was there?

A No.

Q And after he said that he wanted to talk to an attorney, what did you do?

A I put 'um back, took 'um back next door.

Q So, with respect to the HPD 81 form and the rights on that form, his rights were not read to him by yourself at that point, correct?

A No.

Q When he asked to speak to an attorney, he didn't request any particular attorney?

A No.

Q He didn't mention anything about a public defender?

A No.

(Emphases added.) This testimony was largely corroborated by Petitioner's testimony:

[DEFENSE COUNSEL] Q All right. What happened in that room?

A And they asked me questions or they told me that, oh, yeah, *it's like you know you did it and all this stuff that, you know, was that they wanted me to tell them what happened.*

Q Okay. Now who was saying "We know you did it."

A Detective Weiss [sic].

Q What other things were said to you?

A They told me that. Well, he said that they know that I did it and, you know, they want me to tell them what happened, asking me, you know, where's the gun, you know. You—like you and your cousin did it. We know. That's about it.

. . . .

Q Was this conversation between you and the detectives being tape recorded?

A No.

Q Did the detectives ever show you any type of a rights form, what's called an HPD 81 form then?

A No.

Q Okay. Did any of the detectives advise you of any constitutional rights at any point?

A No.

Q Did the issue of you wanting an attorney at any point come up?

A Yes.

Q How did that come up?

A *They told me if I wanted an attorney and I said yes.*

Q All right. Were you ever informed that if you don't have the funds for an attorney, one would be appointed for you?

A No.

Q So when you said yes, that you wanted an attorney, were you invoking your right to counsel at that point?

A Yes.

Q *What did they say then after you did that?*

A *Nothing.* They took me out—they took me out the room and they put me in a cellblock.

Q Back in the cell?

A Yeah.

Q Okay. Did you yourself mention any specific attorney?

A No.

Q Did you have an attorney?

A No.

Q At the time did you know the names of any attorneys in this state?

A No.

Q Did you ever speak to an attorney prior to your arrest that day?

A Um, no.

(Emphases added.) The detective indicated his practice is not to contact an attorney unless there is a specific request by a prisoner to contact one for him or her:

[DEFENSE COUNSEL] Q You mentioned that when a prisoner asks for an attorney, you will make an effort to get an attorney.

[DETECTIVE WEISE] A If a prisoner asks me specifically to contact an attorney whether it be the Public Defender's Office or a specific attorney that's (indiscernible) to him, his family or something, I would make that effort, yes.

Q So, they have to give you a specific, either a name of an attorney or specifically mention a public defender for you to make that effort?

A *If he told me that I need an attorney, will you call an attorney for me, I would do that, but [Petitioner] didn't ask me that.*

Q If he asked for a specific attorney, is it your testimony you would make that call?

A Oh, yes.

Q But you didn't make the call because he didn't ask for a specific attorney?

A He said I just wanna talk to a lawyer. *He didn't make any specifics of whether, what kine'a lawyer, who he wanted to talk to.*

Q Had he said a specific name of an attorney, you would have made the efforts to make a call?

A Yes, I would.

Q And had he specifically mentioned that he wanted to talk to somebody from the Public Defender's, would you have made the call?

A Yes, I would.

(Emphases added.) Petitioner testified he sought an attorney to advise him and believed the police were going to contact one for him:

[DEFENSE COUNSEL] Q Now why did you want an attorney?

A *'Cause if I was gonna say something, I wanted him to come to tell me if I should say something or give me advice, you know.*

Q Okay. When you stated that you wanted an attorney, what did you think was going to happen?

A Um, I thought they was gonna give me an attorney when I said I wanted one.

Q Who did you think was going to get you an attorney?

A Um, the detective.

Q *And why did you think they were going to get you an attorney?*

A *'Cause I told them to and they—they asked me if I wanted to take them and I said, eh—I said yeah.*

Q When you went back to your cell, what were you doing in the cell?

A Um, nothing. Just sitting. Waiting for my, um—the attorney.

Q Did you think the police were going to get you one or place you into contact with one?

A Yeah.

Q Why did you think that?

A 'Cause I told 'em. And they said that I wanted one and I said yeah.

Q Did you think an attorney was going to come to the station?

A Yes.

Q Could you afford any attorney at that time?

A No.

Q Did the detectives ever provide you a number for an attorney?

A No.

Q Did they provide you an [sic] number for the Public Defender's Office?

A No.

The detective made no effort to contact an attorney.

[DEFENSE COUNSEL] Q Between about 9:35 and a little before one o'clock, you did not make any efforts to get [Petitioner] an attorney, correct?

[DETECTIVE WEISE] A That's correct.

Q In other words, you didn't make a call to the Public Defender's Office, right?

A That's correct.

Q And you didn't make any call to any other private type of attorney, correct?

A That's correct.

Q You are familiar, I guess, with HRS 803–9, right?

A Somewhat, yes, sir.

However, no one indicated to Petitioner that a specific request, as defined by Detective Weise, was required:

THE COURT: Q Mr. Ababa, you asked for a lawyer about 9:30—is that right?—in the morning?

A What do you mean?

Q You—you—

A Is that the first—

Q Yeah, the first time you asked for a lawyer.

A Yes. Yes. Yes, Judge. Yes, Judge.

Q And in your mind you thought the police were going to call a lawyer or do you think you'd be given a phone where you could call the lawyer?

A *Well, I thought they was gonna give me a lawyer 'cause they went ask me if I wanted a lawyer—*

Q Okay.

A *And I said yes.*

Q And you said yes.

A Yes.

Q All right. *Did anybody explain to you that they weren't going to call the lawyer but that you could call the lawyer on your own?*

A *No.*

Q If you had been taken into a room with either a pay phone or a free phone—

A Um-hmm.

Q —and given a list, a public defender list, what would you have done?

A Well, I would call them.

Q Okay. And were you taken into a room and put by a phone and said go ahead, call a lawyer?

A No. No.

Q Never happened?

A No. Never happened.

Q Did anybody offer you that option?

A No.

Q Did you ask them when is my lawyer going to come?

A Oh, no. I just went—I just went straight to my cell.

(Emphases added.) Petitioner testified that when no attorney appeared, he believed none would be provided.

[DEFENSE COUNSEL] Q *What were you thinking after this period of time and no attorney showed up?*

A *Well, they weren't gonna give me a lawyer, so I decided to talk to them.*

Q Who wasn't going to give you a lawyer?

A What's that? The detectives.

Q Okay. At some point then you—as you testified, you approached an officer and said you wanted to make a statement; right?

A Yes.

Q Now at some point did you tell either one of the officers "Fuck the lawyer"?

A Yes.

Q Why did you say that?

A 'Cause the lawyer wasn't there.

Q If an attorney had come down during that period of time when you were taken back after requesting an attorney and then by the time you say "Fuck the lawyer," would you have said "Fuck the lawyer"?

A Oh, no, no.

Q Why not?

A *Because if he were to come there, I would have talked to him. I wanted him to tell me, what, should I make—make—you know, say something or not.*

(Emphases added.) Based on the evidence at the hearing, the circuit court concluded that Petitioner's statements must be suppressed because of violations of both Petitioner's constitutional right against self-incrimination and his statutory rights under HRS §§ 803–9(2) (1993) and 803–9(4) (1993). HRS §§ 803–9(2) and (4) state:

It shall be unlawful in any case of arrest for examination:

. . . .

(2) To unreasonably refuse or fail to make a reasonable effort, where the arrested person so requests and prepays the cost of the message, to send a telephone, cable, or wireless message through a police officer or anoth-

er than the arrested person to the counsel or member of the arrested person's family;

. . . .

(4) In case the person arrested has requested that the person see an attorney or member of the personal family, to examine the person before the person has had a fair opportunity to see and consult with the attorney or member of the person's family[.]

In vacating the court's suppression order, the ICA concluded, *inter alia*, that (1) no "request" was made under HRS § 803–9(2), 101 Hawai'i at 357–358, 68 P.3d at 631–632, (2) there was no violation of HRS § 803–9(4) because questioning ceased when Petitioner indicated he wanted an attorney, *see* at 357–358, 68 P.3d at 631–632, (3) the provision of a telephone or the public defender's number was not required unless Petitioner specifically requested them, *see* at 358, 68 P.3d at 632, and (4) there was no duty to refer Petitioner to the public defender's office, *see* at 358–359, 68 P.3d at 632–633.

### III.

We must respectfully disagree with the ICA's holding. By indicating to Petitioner that he had a choice of talking to them or talking to an attorney, the detectives affirmatively indicated to Petitioner that he had the option of speaking to an attorney. The clear import of Detective Weiss's declaration was that two alternatives were available to Petitioner. Reasonably understood, the detective's statement offered Petitioner the choice of speaking to an attorney. In rejecting interrogation by the police, Petitioner obviously chose this alternative.

■ In view of Detective Weiss's statement to him that "[you] can talk to an attorney or you can talk to me," Petitioner's response that he wanted to talk to an attorney in effect was tantamount to a *request* to talk to an attorney within the meaning of HRS § 803–9(2). The underlying purpose in HRS § 803–9(2) is to protect an accused's right to counsel. Subsection (2) " 'grant[s] to a per-

son arrested for examination the right not only of seeing but otherwise communicating with counsel or a member of his or her family.' " *Edwards*, 96 Hawai'i at 233, 30 P.3d at 247 (quoting 1941 Haw. Sess. L. Act 168, at 232–33, Stand. Comm. Rep. No. 324, in 1941 House Journal, at 1249) (brackets omitted).

In that regard, the statute imposes an obligation on the police to make reasonable efforts to contact an attorney "where the arrested person so requests." HRS § 803–9(2). Because on its face the purpose of HRS § 803–9 is to afford certain enumerated "right[s]" to persons in police custody, one of which is access to an attorney, the question whether a request was made cannot rest on a semantical parsing of whether Petitioner asked to "see," to "talk to," to "call," or to "contact" an attorney, as opposed to "requesting" an attorney. As we said in *Edwards*,

HRS § 803–9(2) is consistent with the recommendation set forth in Standard 4–2.1 . . . of the American Bar Association Project on Minimum Standards for Criminal Justice (2nd ed.1986) . . . that "every jurisdiction should guarantee by statute or rule of court *the right of an accused person to prompt and effective communication with a lawyer and should require that reasonable access to a telephone or other facilities be provided for that purpose.*"

*Edwards*, 96 Hawai'i at 233, 30 P.3d at 247 (brackets omitted) (emphasis added). *See People v. Aponte*, 69 A.D.2d 204, 418 N.Y.S.2d 651, 658 (N.Y.App.Div.1979) (where a defendant stated, "I would like to have a lawyer first [before answering questions,]" the police had a duty to ensure that the defendant's "request for an attorney [was] complied with[,]" and the police failed to so comply).

The ICA pointed to the court's finding of fact No. 8, which states, "[Petitioner] did not make any request to call an attorney. He did not know any attorney." Insofar as the first sentence in this finding may be read as signifying that Petitioner did not request an attorney, it is qualified by the second part of finding No. 8 which explains that Petitioner "did not know any attorney." This finding

must be considered in the context of the unchallenged finding of fact No. 3 that, at the five-minute interview, "[Petitioner] invoked his constitutional right to counsel and was returned to his jail cell within five minutes[,]" and the undisputed parts of finding No. 4 that "[Petitioner] desired counsel in order to advise him as to the propriety of proffering a statement[,]" and of finding No. 5 that "[Petitioner] could not afford an attorney." It is evident that the court found Petitioner did request an attorney but did not ask for a specifically named attorney because he did not know any and could not afford one.

The statute requires that, when a defendant being questioned by police indicates that he or she wants counsel, the interrogation must stop[2] and the police must make reasonable efforts to contact counsel. Petitioner's reply that he wanted an attorney in response to the alternatives presented by the detectives was sufficiently precise to put the detectives on notice of their obligations under HRS § 803–9(2). Objectively viewed, Petitioner's response that he wanted to talk to an attorney amounted to a request for an attorney. The officers at that point were required to make reasonable efforts to contact one.

But, it is undisputed that the detectives did nothing, although aware of Petitioner's response. They made no attempt to ascertain from Petitioner whether he knew an attorney who could be contacted, whether Petitioner could afford an attorney, whether Petitioner wanted the use of a telephone and telephone book to contact one, or whether Petitioner desired the public defender's office be contacted.[3] For their part, the detectives exerted no effort at all. Their response falls far short of what the cases have confirmed as reasonable efforts. See Edwards, 96 Hawai'i at 235 n. 16, 30 P.3d at 249 n. 16 (citing State v. Larrett, 127 Or.App. 139, 871 P.2d 1016, 1017 (1994) (police officer (1) gave the defendant two telephone directories, (2) asked the defendant if she wanted to call information when she could not find the number, (3)

allowed her to call her grandmother to get the number, (4) wrote down the attorney's number for her when she recited it, and (5) offered additional time to contact a different attorney because the defendant reached his attorney's answering machine), review denied, 319 Or. 149, 877 P.2d 86 (1994); State v. Greenough, 132 Or.App. 122, 887 P.2d 806, 807–08 (1994) (the arresting officer left the interview room to use a telephone capable of making long-distance calls, obtained the lawyer's number from directory assistance, placed the call, reached a recording that stated that the number had been changed, called the forwarding number, reached an answering machine, and left a message requesting a return call and informing the lawyer of the defendant's need for assistance, attempted to obtain a telephone listing for the lawyer's home, reported to the defendant that he had been unsuccessful in contacting the lawyer-friend); City of Bellevue v. Ohlson, 60 Wash.App. 485, 803 P.2d 1346, 1347–48 (1991) (police officer (1) used a telephone book to locate the phone number of the defendant's attorney, (2) made six attempts to reach the attorney, but was unable to do so, (3) called three different public defenders, but was unable to contact any of them, and (4) offered the defendant an opportunity to contact another attorney)).

Additionally, inasmuch as Detective Weise told Petitioner that if he wanted an attorney then the detective would stop speaking to him and return him to his cell, Petitioner could reasonably presume, as he apparently did, that Petitioner was taken back to his cell to await the arrival of an attorney. See People v. Locke, 152 Cal.App.3d 1130, 200 Cal.Rptr. 20, 21–22 (1984) (where a defendant requested an attorney and was left alone for three hours and "nothing further was said, or done, about such a lawyer; nor was she advised that she could use a telephone in securing one[,]" the court held that "a minimal requirement is that the arrested suspect be told of his or her right, and be

---

2. It was evident the police were engaged in or attempting to engage in interrogation of Petitioner while he was in custody.

3. As the court found, the detectives could have made a telephone, a telephone book, and the public defender's telephone number available to Petitioner. See Edwards, 96 Hawai'i at 236 n. 17, 30 P.3d at 250 n. 17.

given an opportunity, to use a telephone" and that "[a]nything less would make of *Miranda* a hollow ineffectual pretense").

Obviously, what constitutes reasonable efforts in any situation is determined by the surrounding circumstances. The question posed by HRS § 803–9(2) is whether, under the particular facts of the case, the measures taken by the police were reasonably calculated to satisfy the duty imposed by the statute. "Objectively viewed, the [police] efforts here lacked any real and substantive compliance with the statute." *Edwards*, 96 Hawai'i at 237, 30 P.3d at 251. As stated previously, the police made no effort to follow up on Petitioner's request to talk to an attorney. Having made no effort at all, the necessity of making a reasonableness evaluation does not arise. However, the lack of an express statutory command to contact the public defender's office, *see* 101 Hawai'i at 358, 68 P.3d at 632–633, would not be determinative. Undisputed evidence of a practice by Detective Weise or the police department of contacting the public defender's office and the availability of the public defender's office to serve as counsel are facts which may be considered.[4] In this case, such evidence served to underscore the ease with which such contacts could have been made had any effort been attempted in the first place.

In light of the detectives' failure to make reasonable efforts with respect to Petitioner's request for a lawyer, the detectives' examination of Petitioner before he had a fair opportunity to see and consult with one, also violated HRS § 803–9(4). Under the circumstances of this case, there was never a fair opportunity afforded Petitioner to see and consult with counsel.

### IV.

In *Edwards*, the defendant did not testify that the failure of the police to follow through on her request for an attorney was a factor in her decision to subsequently waive her constitutional rights and to provide an incriminating statement. *See Ed-*

*wards*, 96 Hawai'i at 239, 30 P.3d at 253 ("[The d]efendant did not testify at the hearing on the motion to suppress, so it cannot be ascertained whether the failure to call her attorney affected her decision to give her statement."). In this case, however, there is direct evidence that Petitioner's decision to waive his rights and give a statement was connected to the detectives' failure to obtain an attorney. As Petitioner testified, as a result of the five-minute meeting with the detectives, (1) he wanted an attorney to advise him on what if any statement to make, (2) he believed the detectives would contact an attorney "when [he] said [he] wanted one," (3) he sat in his cell waiting for an attorney, (4) he could not afford an attorney, (5) the detectives did not provide him with the phone number of an attorney or that of the public defender's office, and (6) after waiting for approximately three hours, he believed the detectives "weren't gonna give [him] a lawyer so he decided to talk to them." He approached one of the cell block officers and said, as verified by the officer, "Fuck the lawyer." Petitioner testified he said that "[b]ecause the lawyer wasn't there."

Here, Petitioner has "demonstrated a connection between the statutory violation and the evidence to be suppressed." *Edwards*, 96 Hawai'i at 239, 30 P.3d at 253. Petitioner testified at the motion to suppress that his acquiescence in giving a statement was precipitated by the absence of an attorney. By the time of the five-minute interview, Petitioner had been held in custody for approximately twenty hours, apparently without any contact with persons outside the station. Inasmuch as "[t]he mandate of HRS § 803–9(2) has been the law in this jurisdiction for over sixty years and is representative of like statutes adopted in many states, . . . [w]e would not diminish the gravity of any violation of HRS § 803–9." *Id.* On the record, there was evidence to a preponderant degree, *see id.* at 232, 30 P.3d at 246 ("The proponent of the motion to suppress must satisfy [his or her] burden of proof by a preponderance of the

---

4. Although HRS chapter 809 expressly sets out duties to be followed by the police, neither the record in *Edwards,* nor in the instant case, re-

veals any established police department procedures for observing the rights set forth in HRS chapter 809.

evidence." (Quoting *State v. Wilson*, 92 Hawai'i 45, 58, 987 P.2d 268, 271 (1999). (Internal quotation marks and citation omitted.))), that the violation of HRS §§ 803–9(2) and 803–9(4) "ultimately had an adverse impact on [Petitioner]'s substantive rights." *Id.* at 239, 30 P.3d at 253. The statement rendered on January 4, 2000, therefore, was correctly suppressed. *See id.* at 239 n. 23, 30 P.3d at 253 n. 23; *People v. Gordon*, 77 A.D.2d 659, 430 N.Y.S.2d 661, 661, 665 (N.Y.App.Div. 1980) (Where a defendant stated, "I want to talk to a lawyer[,]" the court held that "[n]either the police nor the District Attorney's office made any effort to obtain counsel for defendant, and defendant's subsequent waivers were therefore uncounseled and involuntary."); *cf. People v. New York State Division of Parole*, 117 Misc.2d 687, 459 N.Y.S.2d 242, 246 (N.Y.Sup.Ct.1983) ("It seems elemental to this Court that where a parolee has requested the assistance of counsel for his final parole revocation hearing ... and no effort has been shown on the record to have been made to supply petitioner with *any* legal counsel prior to such hearing, that such 'waiver' as occurred in this case cannot be deemed as knowing, intelligent or voluntary, but rather, the result of the petitioner's frustration with the legal system. The right to due process cannot be circumvented by placing a wall of silence and inaction in petitioner's path." (Emphasis in original.)).

■ In light of our determination that Petitioner's statement must be suppressed for violation of HRS §§ 803–9(2) and 803–9(4), we need not reach the other grounds upon which the court rested its order. "[T]he purpose served by the right to communicate with a lawyer is broader in scope than that protected by the *Miranda* warning[; hence,] ... the police can comply with *Miranda* requirements but still violate HRS § 803–9(2)." *Edwards*, 96 Hawai'i at 234, 30 P.3d at 248. We agree with the order of the court that, under the circumstances of this case, Petitioner's statements must be suppressed.

Accordingly, the ICA's November 29, 2002 decision is reversed and the court's February 6, 2001 order granting Petitioner's motion to suppress is affirmed.

**Dissenting Opinion by NAKAYAMA, J., with whom MOON, C.J., joins.**

I respectfully dissent. I believe that the application for writ of certiorari filed by Petitioner–Appellee Harvey Ababa (Ababa) should be dismissed as improvidently granted, inasmuch as (1) the Intermediate Court of Appeals (ICA) did not gravely err in concluding that the circuit court's finding of fact that Ababa did not request an attorney, which was unchallenged and supported by the record on appeal, obligated the ICA to hold that Hawai'i Revised Statutes (HRS) § 803–9(2) (1993) [1] was not triggered, and (2) even assuming that Ababa's equivocal response constituted a request triggering HRS § 803–9(2), the ICA did not gravely err because there was no demonstrated connection between the alleged statutory violation and statements made by Ababa after he waived his constitutional right against self-incrimination [2] pursuant to the fifth amendment of the

---

1. HRS § 803–9(2) provides in relevant part:

   It shall be unlawful in any case of arrest for examination:

   . . . .

   (2) To unreasonably refuse or fail to make a reasonable effort, where the arrested person so requests and prepays the cost of the message, to send a telephone, cable, or wireless message through a police officer or another than the arrested person to the counsel or member of the arrested person's family[.]

2. As the ICA properly held, Ababa's right to counsel pursuant to the sixth amendment of the United States Constitution and article I, § 14 of the Hawai'i Constitution was not violated, as this right does not attach until the initiation of adversarial judicial criminal proceedings, which had not been initiated when Ababa made the statements sought to be suppressed. *See State v. Ababa*, 101 Hawai'i at 359–360, 68 P.3d at 633–634, (Haw.Ct.App. 2002). The right to counsel at issue in this appeal derives from the right against self-incrimination pursuant to the fifth amendment of the United States Constitution and article I, § 10 of the Hawai'i Constitution, which requires that prior to custodial interrogation, the arrested person be informed of, *inter alia*, the right to remain silent and the right to the presence of an attorney, whether retained or appointed. *See State v. Hoey*, 77 Hawai'i 17, 32–33, 881 P.2d 504, 519–20 (1994). Thus, the terms "right against self-incrimination" and "right to counsel" are utilized interchangeably as referring to the right pursuant to the fifth amendment and article I, § 10.

United States Constitution[3] and article I, § 10 of the Hawai'i Constitution.[4]

I. *The ICA did not gravely err because the finding that Ababa did not request an attorney, unchallenged and supported by the record on appeal, obligated the ICA to hold that HRS § 803–9(2) was not triggered.*

Pursuant to HRS § 803–9(2), when an arrested person requests that a police. officer send a message to an attorney, the police officer is obligated to make a reasonable effort "to send a telephone, cable, or wireless message" to an attorney. HRS § 803–9(2). One of the legislature's purposes for imposing such an obligation was to facilitate attorney-client communication while in custody. *See* Hse. Stand. Comm. Rep. No. 324, in 1941 House Journal, at 1249. This obligation, however, is not unlimited. It is triggered only when the arrested person makes a request, and thus, it is imperative that this request be clear and unequivocal.

In this case, Ababa's assertion that he would rather talk to an attorney, in response to Honolulu Police Department (HPD) Detective Mark Wiese (Detective Wiese) setting forth Ababa's alternatives (i.e. that he could either talk to Detective Wiese or talk to an attorney, thereby requiring the interrogation to cease), was equivocal at best. Based on the record, a reasonable trier-of-fact could find that when Ababa stated that he would rather talk to an attorney, he was not only asserting his right against self-incrimination but was also asking Detective Wiese to actually call an attorney for him. On the other hand, the record also reasonably supports a conclusion that Detective Wiese believed

Ababa's response to mean simply that he was asserting his right against self-incrimination, and thus, opting for the alternative that required the cessation of interrogation. This is reasonable, inasmuch as the response was equivocal and a phone was readily available for Ababa to use to contact an attorney on his own.

Even though Ababa's equivocal response could possibly be interpreted either way, in finding of fact no. 8, the circuit court ruled that "Mr. Ababa did not make any request to call an attorney. He did not know any attorney." The majority sees the latter statement as a qualifying statement and points to, *inter alia*, the finding that Ababa invoked his constitutional right, as indicating that the circuit court did not really mean that Ababa did not make a request. I agree that the circuit court's order is not a picture of clarity. However, Ababa's knowledge regarding the identity of a specific attorney does not affect the absence of an actual request to contact an attorney, as a general request for a public defender could have been made. In addition, Ababa's assertion of his constitutional right against self-incrimination is independent of whether Ababa actually requested that Detective Wiese contact an attorney for him.

As the circuit court ruled in finding of fact no. 8, Ababa did not make a request for an attorney, and because this finding was not challenged on appeal, it stands. Even if Ababa had challenged this finding on appeal, it is not clearly erroneous because the record does not lack substantial evidence that Ababa failed to make a request. It is undisputed that Ababa did not ever specifically ask Detective Wiese to call an attorney for him. As

---

3. The fifth amendment of the United States Constitution provides:

   No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a. witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for use without just compensation.

4. Article I, § 10 of the Hawai'i Constitution provides:

   No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury or upon a finding of probable cause after a preliminary hearing held as provided by law, except in cases arising in the armed forces when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy; nor shall any person be compelled in any criminal case to be a witness against oneself.

**220**

the circuit court's finding was unchallenged and supported by the record, this court should adhere to the finding that Ababa did not request an attorney pursuant to HRS § 803–9(2). As there was no request, the ICA did not gravely err in holding that HRS § 803–9(2) was not triggered.

II. *The ICA did not gravely err because there was no demonstrated connection between the alleged statutory violation and statements made by Ababa after he waived his constitutional right against self-incrimination.*

The conclusion that a statutory violation has occurred does not lead inexorably to a ruling suppressing the evidence sought to be admitted. *State v. Pattioay,* 78 Hawai'i 455, 466, 896 P.2d 911, 922 (1995). Thus, a violation of HRS § 803–9 does not require suppression unless the arrested person can demonstrate "a connection between the alleged statutory violations and the evidence to be suppressed." *State v. Edwards,* 96 Hawai'i 224, 239–40, 30 P.3d 238, 253–54 (2001).

In this case, Ababa seeks to suppress statements made to HPD detectives after he waived his right against self-incrimination. Ababa, however, fails to demonstrate a sufficient connection between the statutory violation (i.e. the failure of HPD detectives to make reasonable efforts to contact an attorney) and the evidence to be suppressed (i.e. Ababa's statements made after his voluntary, intelligent, and knowing waiver of his right against self-incrimination). The only evidence offered of a connection was Ababa's statement that he waived his right because he felt that he was not going to be provided with an attorney. A review of the record, however, reveals the questionable nature of this statement. Not once during the three hour time period between invoking his right against self-incrimination and waiving this right did Ababa inquire about his alleged request for an attorney or the delay in obtaining an attorney. At no time did Ababa say he was giving up his right because he felt an attorney would not be provided. The finding that "Ababa exclaimed, 'Fuck the lawyer,' because an attorney had not yet come to the station" evidences at most Aba-

ba's change of heart and not his belief that an attorney would not be provided. As such, I do not believe that a sufficient connection has been demonstrated.

Even assuming that Ababa initially felt that an attorney would not be provided, it is significant that he was the one to initiate further discussion with HPD detectives and to assert that he would be waiving his right to counsel. It is also significant that, upon initiating the subsequent discussion with HPD detectives, Ababa was told, *inter alia,* that an attorney would be provided for him if he was unable to afford one, as evidenced via an HPD Form 81. Ababa then voluntarily, intelligently, and knowingly, and not in reliance on the belief that an attorney would not be provided, waived his constitutional right against self-incrimination. Because there was no demonstrated connection between the alleged violation of HRS § 803–9(2) and Ababa's statements made after his voluntary, intelligent, and knowing waiver of his right against self-incrimination, suppression was not warranted. Based on the foregoing, I believe that the ICA did not gravely err and would dismiss the application for writ of certiorari as improvidently granted. Accordingly, I dissent.