289 P.3d 964

STATE Of Hawai'i, Plaintiff–Appellant,

v.

Robert John McKNIGHT, Jr., also known as atropical_knight, Defendant–Appellee.

and

State of Hawai'i, Plaintiff–Appellee,

v.

Robert John McKnight, Jr., also known as atropical_knight, Defendant–Appellant.

Nos. 28431, 28901.

Intermediate Court of Appeals of Hawai'i.

Jan. 31, 2012.

As Corrected Feb. 22, 2012.

Albert Cook, Deputy Attorney General, on the briefs, for Plaintiff–Appellant/Plaintiff–Appellee.

Christopher Martin Dunn, on the briefs, for Defendant–Appellee.

Benjamin E. Lowenthal, on the briefs, for Defendant–Appellant.

NAKAMURA, Chief Judge, and FOLEY and FUJISE, JJ.

Opinion of the Court by NAKAMURA, C.J.

Robert John McKnight, Jr. (McKnight), who was 37 years old, met and chatted over the internet with "Chyla," who stated that she was a 15–year–old girl. Their internet chats involved McKnight's "teaching" "Chyla" about sex and discussing various sexual acts which McKnight would be willing to perform with "Chyla." On two occasions, McKnight used a web camera to show himself masturbating during chats with "Chyla." Unbeknownst to McKnight, "Chyla" was actually Special Agent Vincente Domingo (Agent Domingo), acting in an undercover capacity as a member of the Hawai'i Internet Crimes Against Children Task Force.

McKnight arranged to meet "Chyla" in person. He purchased a ticket for "Chyla" to fly from Honolulu to Maui and agreed to pick her up at the Kahului Airport.

McKnight drove his car to the Kahului Airport at the scheduled arrival time for "Chyla's" flight, and he was arrested. After his arrest, McKnight gave a statement to Agent Domingo about McKnight's communications with "Chyla." Agent Domingo then prepared, obtained, and executed a search warrant for McKnight's residence. Over one hundred images of suspected child pornography were recovered from computer hard drives and floppy disks seized pursuant to the search warrant.

McKnight was charged with electronic enticement of a child in the first degree (Count 1) and promoting child abuse in the third degree (Count 2). Count 2 was based on the child pornography evidence obtained pursuant to the search warrant. Prior to trial, the Circuit Court of the Second Circuit (Circuit Court)[1] granted McKnight's motions to suppress his statement to Agent Domingo and the evidence seized pursuant to the search warrant. The State of Hawai'i (State) moved to sever Count 1 from Count 2, so that it could proceed to trial on Count 1 and appeal the Circuit Court's suppression of evidence that was critical to Count 2. The Circuit Court granted the State's motion and severed the counts. After a trial on Count 1, the jury found McKnight guilty as charged of first-degree electronic enticement of a child. The Circuit Court sentenced McKnight to five years of probation, subject to the condition that he serve one year in jail.

In these consolidated appeals, McKnight appeals from the Circuit Court's "Judgment Guilty Conviction and Probation Sentence" (Judgment) in Appeal No. 28901, and the State appeals from the Circuit Court's "Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress Statement as Involuntary and Granting Defendant's Motion to Suppress Evidence Seized Pursuant to Invalid Warrant" (Suppression Order) in Appeal No. 28431.

In McKnight's appeal, he argues: (1) the Circuit Court abused its discretion in permitting the jury to view the scenes of McKnight masturbating that were transmitted to "Chyla"; (2) the Circuit Court plainly erred in

1. The Honorable Joel E. August presided.

instructing the jury on the elements for the offense of first-degree electronic enticement of a child; and (3) there was insufficient evidence to support McKnight's conviction or indictment for first-degree electronic enticement of a child because the State failed to show that he used a computer or other electronic device to travel to the airport.

In the State's appeal, it argues: (1) the Circuit Court erred in concluding that the search warrant was invalid and suppressing evidence recovered pursuant to the search warrant on the ground that the judge issuing the warrant had misdated it; (2) the Circuit Court erred in suppressing McKnight's inculpatory statements on the ground that McKnight had not validly waived his *Miranda* rights.

For the reasons set forth below, we affirm McKnight's conviction for first-degree electronic enticement of a child. We vacate the Circuit Court's Suppression Order and remand the case for further proceedings. In vacating the Circuit Court's Suppression Order, we overrule our prior decision in *State v. Endo*, 83 Hawai'i 87, 924 P.2d 581 (App. 1996), where we held under similar circumstances that a misdated search warrant was invalid. The Circuit Court relied upon *Endo* in suppressing the search warrant evidence.

## BACKGROUND

### I.

Agent Domingo, posing as a 15–year–old girl named "Chyla," entered an internet chat room with the heading "Romance," using the screen name "Chyla808." McKnight, using the screen name "atropical_knight," contacted "Chyla," and they began chatting online. During their initial chat, "Chyla" stated that she was a 15–year–old girl who lived on O'ahu. McKnight stated that he was 37 years old and lived on Maui. Their chat conversation turned to sex. McKnight recounted the number of women he had sex with and asked "Chyla" if she was still a virgin. "Chyla" responded that she was a virgin and did not know much about sex.

Between June 13, and July 5, 2006, McKnight and "Chyla" communicated nine times through internet chats with the use of

their computers, and three times over the telephone. For the telephone conversations, Special Agent Woletta Kim (Agent Kim) assumed the role of "Chyla" and used a voice modulator to sound like a fifteen-year-old girl. "Chyla" repeatedly advised McKnight that she was fifteen years old. The internet chats were sexual in nature, with McKnight "teaching" "Chyla" about sexual matters such as arousal, masturbation, and various sexual acts he would perform with her if she was willing.

On two occasions, McKnight used his web camera to show himself masturbating while chatting online with "Chyla." McKnight discussed "Chyla's" coming to visit him on Maui and the various sexual acts they could engage in with each other.

McKnight offered to pay for "Chyla" to fly from O'ahu to Maui, and "Chyla" accepted McKnight's invitation. "Chyla" explained that she told her mother that she would be staying with a friend and the friend's family on Maui. McKnight purchased a ticket for "Chyla" and agreed to pick her up at the Kahului Airport when she arrived on July 6th. McKnight told "Chyla" that he would be driving a light blue Nissan Xterra and gave her his license plate number. On July 6th, McKnight drove a Nissan Xterra, matching the description and license plate number he had given to "Chyla," to the Kahului Airport at the scheduled arrival time for "Chyla's" flight. McKnight was arrested at the airport when he got out of the vehicle by Agent Domingo, Agent Kim, and Maui police officers.

### II.

#### A.

McKnight was transported to the police station in Wailuku and placed in an interview room. Agent Domingo reviewed the *Miranda* rights with McKnight through the use of an advice-of-constitutional-rights form. Among other things, the form states, "You have a right to counsel (attorney) of your choice or to talk to anyone else you may want to"; "You also have a right to have an attorney present while I talk to you"; and "If you

cannot afford to hire an attorney, the court will appoint one for you." When asked if he wanted an attorney, McKnight requested an attorney. Agent Domingo did not ask McKnight any further questions and left the room to confer with Agent Kim. Agent Domingo talked to Agent Kim about whether he could ask McKnight for a description of his residence because Agent Domingo planned to obtain a search warrant for the residence. The agents decided that asking for a description would be permissible because they did not view it as interrogation about the case.

Agent Domingo re-entered the interview room a short time after he had left. Upon Agent Domingo's re-entry, McKnight asked if he could call his mother. Agent Domingo refused this request, stating that the agents were still investigating the case. Agent Domingo was concerned that McKnight would signal his mother to dispose of his computer before Agent Domingo could obtain a search warrant.[2] McKnight then asked Agent Domingo what was going to happen next. Agent Domingo replied that "we are going to do a search warrant on [your] residence." In response, McKnight said that he changed his mind, that he did not realize the severity of the crime, and that he wanted to give a statement.

After McKnight said that he was willing to provide a statement, Agent Domingo began recording the interview. During the beginning of the interview, McKnight asked if Agent Domingo would allow McKnight to call his mother after the interview was over. They discussed this subject as follows:

> [McKnight]: . . . Now, will—after this is done, will you allow me to call my mother?
>
> [Agent Domingo]: Again, I am not going to promise you anything. Okay? There's no promises or anything. If you want to give a statement or not, that's strictly up to you. Okay. Again, I know you stopped, you stopped us, okay, that you said you changed your mind at this point, and—but, again, I am not going to—I can't promise you anything. There's no promises or guarantees, okay, at this stage.
>
> [McKnight]: Okay.

> [Agent Domingo]: Do you still want to talk to me?
>
> [McKnight]: Not unless I go let my mother know.
>
> [Agent Domingo]: Again, I can't promise you anything. Like I told you, there's no promises or— —I can't give—say, okay, I'll—I'll let you do this if you give me a statement. There's nothing like that. There's no promises, no guarantees. If you want to give me a statement, like you told me that, you know, you changed your mind, because you didn't realize the severity of the crime, then, fine. But, again, I can't promise you anything. You've got to tell me what you want to do, Robert.
>
> [McKnight]: Go ahead.
>
> [Agent Domingo]: What?
>
> [McKnight]: Go ahead.
>
> [Agent Domingo]: Go ahead, what?
>
> [McKnight]: Continue.
>
> [Agent Domingo]: You want to continue?
>
> [McKnight]: Yes.
>
> [Agent Domingo]: You sure now?
>
> [McKnight]: Yes.
>
> [Agent Domingo]: Again, I'm not promising you or guaranteeing you anything.
>
> [McKnight]: Yes.
>
> [Agent Domingo]: You understand that? Are you sure?
>
> [McKnight]: Yes.

There was a lengthy pause after Agent Domingo asked McKnight what he wanted to do before McKnight responded that he wanted to "[g]o ahead" with the interview. Agent Domingo reviewed with McKnight the circumstances regarding McKnight's initial request for an attorney and subsequent decision to provide a statement:

> [Agent Domingo]: Okay. Okay, Robert, I had read you your constitutional rights, I showed you the constitutional rights form earlier?
>
> [McKnight]: It's that, yes.
>
> [Agent Domingo]: And at that time you said you understood it, that you wanted an

---

**2.** It turned out that McKnight lived with his mother.

attorney, is that correct, when you first read it?

[McKnight]: When I first read it, yes.

[Agent Domingo]: Yes. Okay. We were packing up, you decided that you changed your mind, you want to give a statement now, is that correct?

[McKnight]: Yes.

[Agent Domingo]: Okay. You told me that it's because you didn't understand the severity of the crime, is that correct?

[McKnight]: Yes.

[Agent Domingo]: Okay. Did I force you in any way to make a statement?

[McKnight]: Force me, no.

[Agent Domingo]: Did I promise you or guarantee you anything in return—

[McKnight]: No.

[Agent Domingo]: —for a statement?

[McKnight]: No.

[Agent Domingo]: Is there any reason why you could not make a statement?

[McKnight]: At this time, no.

[Agent Domingo]: Were you threatened or coerced in any way to make a statement?

[McKnight]: No.

[Agent Domingo]: Okay. Again, this statement you are about to give, is that of your own freewill?

[McKnight]: Yes.

[Agent Domingo]: You still want to make the statement, is that correct?

[McKnight]: Yes.

[Agent Domingo]: Okay. Again, Robert, it's strictly up to you. It's your decision again, Robert, like I told you, I'm not promising or guaranteeing you anything. You understand that?

[McKnight]: I understand.

Agent Domingo presented a second advice-of-constitutional-rights form to McKnight and reviewed the form with him. McKnight acknowledged understanding his rights, initialed the advice-of-rights portion of the form, answered "no" to the question "Do you want an attorney now?", and signed the form, thereby signifying the waiver of his rights, including his right to an attorney. During the interview, McKnight made incriminating statements about his relationship with "Chyla." Among other things, McKnight admitted to chatting with "Chyla" over the internet; that "Chyla" informed McKnight that she was 15 years old; that using a web camera, McKnight twice sent images of himself masturbating to "Chyla"; that he purchased a plane ticket for "Chyla" to travel from Honolulu to Maui; that he went to the airport to pick up "Chyla"; and that during their online chats, McKnight discussed engaging in sexual acts with "Chyla" when she came to Maui.

### B.

After taking McKnight's statement, Agent Domingo prepared a search warrant to search McKnight's residence and car and an affidavit in support of the warrant. He presented the search warrant and accompanying affidavit to Judge Simone Polak on July 6, 2006, the same day that McKnight was arrested. The warrant stated in pertinent part: "This warrant may be served and the search made on or before July 16, 2006, a date not to exceed ten (10) days from the issuance of this search warrant...." Agent Domingo's affidavit in support of the search warrant also stated in pertinent part:

That your affiant commenced the actual physical mechanics of preparing this affidavit and attached search warrant at 1330 hours, on July 06, 2006....

. . . .

Therefore your affiant requests that this warrant contain a direction that it shall be executed on or before July 16, 2006, a date not to exceed ten (10) days from the issuance of this search warrant...."

Although the search warrant and the supporting affidavit were submitted on July 6, 2006, and sought authority to execute the warrant for a period of ten days until July 16, 2006, Judge Polak misdated the warrant as having been being signed by her on June 6, 2006. The ending portion of the search warrant, which was signed by Judge Polak, provided:

This warrant may be served and the search made on or before July 16,

2006 , a date not to exceed ten (10) days from the issuance of this search warrant, between the time(s) indicated below by (an) "X"(s):

 XX 6:00 a.m. and 10:00 p.m.

 _____ 10:00 p.m. and 6:00 a.m.

GIVEN UNDER MY HAND, and dated this 6th day of June , 2006, at Wailuku , County of Maui, State of Hawaii.

 _____[signature of Judge Polak]
JUDGE OF THE ABOVE–ENTITLED COURT
STATE OF HAWAII

Judge Polak also misdated and signed Agent Domingo's affidavit as having been "[s]ubscribed and sworn to before [her]" on the "6th day of June, 2006, at 7:50 P.M."

The search warrant was executed on July 6, 2006. From McKnight's residence, agents recovered, among other things, computer hard drives and floppy disks. Robert Jahier (Jahier), a computer forensic examiner for the Attorney General's Office, examined this evidence and found over one hundred "graphic files of suspected child pornography."

### III.

McKnight was indicted by a grand jury and charged with first-degree electronic enticement of a child, in violation of Hawaii Revised Statutes (HRS) § 707–756 (Supp. 2006)[3] (Count 1), and third-degree promoting child abuse, in violation of HRS § 707–752(1)(a) (Supp.2010)[4] (Count 2). McKnight filed a motion to suppress his statement to Agent Domingo and a motion to suppress the evidence seized pursuant to the search warrant. An evidentiary hearing was held on McKnight's motions, and Agent Domingo and Jahier were the only witnesses who testified.

The Circuit Court granted both motions to suppress and issued its Suppression Order on February 1, 2007. The Circuit Court suppressed McKnight's tape-recorded statement to Agent Domingo on the ground that "the State has not carried its burden of proof in showing that [McKnight's] waiver of his *Miranda* rights was voluntarily, knowingly, and intelligently made." With respect to the search warrant evidence, the Circuit Court concluded that the search warrant, including the search for child pornography, was supported by probable cause. However, based on this court's decision in *Endo*, 83 Hawai'i 87, 924 P.2d 581, the Circuit Court ruled that because Judge Polak had misdated the search warrant as being issued on June 6, 2006, instead of July 6, 2006, the warrant became facially invalid on June 16, 2006, ten

---

**3.** At the time relevant to this case, HRS § 707–756 (Supp.2006) provided, in pertinent part, as follows:

> **§ 707–756 Electronic enticement of a child in the first degree.** (1) Any person who, using a computer or any other electronic device:
> (a) Intentionally or knowingly communicates:
> (i) With a minor known by the person to be under the age of eighteen years;
> (ii) With another person, in reckless disregard of the risk that the other person is under the age of eighteen years, and the other person is under the age of eighteen years; or
> (iii) With another person who represents that person to be under the age of eighteen years; and
> (b) With the intent to promote or facilitate the commission of a felony:
> (i) That is a murder in the first or second degree;
> (ii) That is a class A felony; or
> (iii) That is an offense defined in section 846E–1;

> agrees to meet with the minor, or with another person who represents that person to be a minor under the age of eighteen years; and
> (c) Intentionally or knowingly travels to the agreed upon meeting place at the agreed upon meeting time;
> is guilty of electronic enticement of a child in the first degree.

The current version of HRS § 707–756(1) (Supp.2010) is the same except that the "and" between subsections (1)(a) and 1(b) has been deleted and subsection (1)(b)(iii) has been amended to read: "That is another covered offense as defined in section 846E–1". *See* 2008 Haw. Sess. Laws, Act 80 § 3, at 228.

**4.** HRS § 707–752(1)(a) provides, in pertinent part, as follows:

> **[§ 707–752] Promoting child abuse in the third degree.**
> (1) A person commits the offense of promoting child abuse in the third degree if, knowing or having reason to know its character and content, the person possesses:
> (a) Child pornography[.]

days after its erroneous issuance date. The Circuit Court suppressed the evidence recovered during the execution of the search warrant on July 6, 2006, on the ground that the evidence had been seized pursuant to an invalid warrant.

The Circuit Court granted the State's motion to sever Count 1 from Count 2. The State filed a notice of appeal from the Suppression Order, and it proceeded to trial on the Count 1 charge of first-degree electronic enticement of a child. The jury returned a verdict of guilty as charged on Count 1, and the Circuit Court filed its Judgment regarding Count 1 on November 14, 2007. McKnight appeals from that Judgment.

## DISCUSSION

### I.

We first address McKnight's appeal of his conviction for first-degree electronic enticement of a child.

### A.

■ During McKnight's chats with "Chyla," McKnight on two occasions sent live images showing himself masturbating via his web camera to "Chyla." Agent Domingo used a computer program to capture these images in video form. Over McKnight's objection, the State was permitted to introduce videos of McKnight masturbating for "Chyla" at trial.

McKnight argues that the Circuit Court abused its discretion in permitting the jury to view the videos of McKnight masturbating. He claims that the videos of the masturbation scenes should have been excluded pursuant to Hawaii Rules of Evidence (HRE) Rule 403 (1993), which provides in pertinent part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" We disagree.

A trial court's evidentiary decisions based on HRE Rule 403 require a judgment call and are reviewed for an abuse of discretion. *State v. Richie*, 88 Hawai'i 19, 37, 960 P.2d 1227, 1245 (1998). An abuse of discretion occurs when "the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Lee*, 90 Hawai'i 130, 134, 976 P.2d 444, 448 (1999) (internal quotation marks and citation omitted).

The video evidence of McKnight showing himself masturbating for "Chyla" was extremely probative of his intent to promote or facilitate the commission of one of the predicate felonies necessary to prove first-degree electronic enticement of a child. The State prosecuted McKnight under the theory that he intended to promote or facilitate the commission of the predicate felony of first-degree sexual assault or third-degree sexual assault of a minor who is at least fourteen years old but less than sixteen years old.[5]

---

**5.** To establish the offense of first-degree electronic enticement of a child as charged against McKnight, the State was required to prove that McKnight intended "to promote or facilitate the commission of a felony ... [t]hat is an offense defined in Section 846E–1." HRS § 707–756(1)(b) (Supp.2006). First-degree sexual assault of a minor who is at least fourteen years old but less than sixteen years old, in violation of HRS § 707–730(1)(c) (Supp.2010), and third-degree sexual assault of such a minor, in violation of HRS § 707–732(1)(c) (Supp.2010), both qualify as felony offenses defined in HRS § 846E–1.

HRS § 707–730(1)(c) provides:

§ **707–730 Sexual assault in the first degree.** (1) A person commits the offense of sexual assault in the first degree if:

....

(c) The person knowingly engages in sexual penetration with a person who is at least

fourteen years old but less than sixteen years old; provided that:

(i) The person is not less than five years older than the minor; and

(ii) The person is not legally married to the minor[.]

HRS § 707–732(1)(c) provides:

§ **707–732 Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:

....

(c) The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:

(i) The person is not less than five years older than the minor; and

(ii) The person is not legally married to the minor[.]

The videos of McKnight masturbating for "Chyla" provided direct and compelling evidence of McKnight's intent to engage in sexual activity with "Chyla," a critical issue in the case. It provided clear and unambiguous evidence of McKnight's motives and desires regarding his relationship with "Chyla" and showed the extreme actions McKnight was willing to undertake in order to entice "Chyla." In denying McKnight's motion to exclude the masturbation videos, the Circuit Court cited the State's position that the videos were the best evidence of what took place and found that the videos were part of the res gestae.

The probative value of the videos was heightened by McKnight's defense of entrapment. In opening statement, McKnight suggested that he was induced by law enforcement to engage in the charged criminal conduct. McKnight referred to his chats with "Chyla" as taking place in an "anonymous fantasy land" and contended that this case would have stayed in "some electronic never, never land, but for the encouragement of the Attorney General's investigators[.]" The videos showing McKnight masturbating for "Chyla" served to refute McKnight's entrapment claim. It demonstrated that, motivated by his own sexual desire, McKnight's intent went beyond simply engaging in an anonymous fantasy and that he intended to engage in real-life sexual activity with a minor; that he was ready and willing to commit the charged offense; and that his criminal conduct was not simply the product of inducement or encouragement by law enforcement.

McKnight argues that the masturbation videos were unfairly prejudicial because the State had other means of proving McKnight's intent to have sex with "Chyla," such as the content of McKnight's chats with "Chyla" and Agent Domingo's testimony describing McKnight's masturbation. We are not persuaded. A picture, or in this case the videos, are worth a thousand words. The masturbation videos were the strongest evidence of McKnight's intent to engage in sexual activity with "Chyla." They provided an accurate depiction of McKnight's actual conduct and insight into McKnight's state of mind that could not be reproduced by other evidence. Indeed, McKnight does not dispute that the masturbation videos were the most effective means of proving McKnight's intent to engage in sexual activity with "Chyla."

"Probative evidence always 'prejudices' the party against whom it is offered since it tends to prove the case against that person." *State v. Klafta,* 73 Haw. 109, 115, 831 P.2d 512, 516 (1992). HRE Rule 403, however, is only concerned with evidence that presents a danger of "unfair prejudice" or "an undue tendency to suggest decision on an *improper basis,* commonly, though not necessarily, an emotional one." HRE Rule 403 cmt. (emphasis added). In this case, any danger of unfair prejudice from the masturbation videos was significantly diminished by the manner in which the Circuit Court conducted the jury selection. During jury selection, the Circuit Court and defense counsel advised the potential jurors that the trial evidence would include graphic video containing nudity and sexual acts. Defense counsel was permitted to question the potential jurors about whether such evidence would make them uncomfortable or prevent them from fairly evaluating the evidence. Defense counsel also asked if anyone would be unable to follow the court's instructions on the law because they felt that the act of broadcasting oneself doing a sexual act was morally wrong. None of the prospective jurors indicated that viewing video of this nature would make them uncomfortable, render them unable to follow the court's instructions, or prevent them from being fair and impartial.

We conclude that the Circuit Court did not abuse its discretion (1) in determining that the probative value of the challenged masturbation videos was not substantially outweighed by the danger of unfair prejudice and (2) in admitting such evidence. *See Phillips v. State,* 269 Ga.App. 619, 604 S.E.2d 520, 528 (2004) (concluding that the trial court did not abuse its discretion in admitting video of defendant masturbating which was linked to the crime charged).

B.

McKnight argues that the Circuit Court plainly erred in instructing the jury on the

elements for the offense of first-degree electronic enticement of a child. McKnight asserts that the Circuit Court's instruction departs from the clear structure and plain language of HRS § 707–756(1), which defines the offense of first-degree electronic enticement of a child. In particular, McKnight reads HRS § 707–756(1) as requiring proof that a defendant used a computer or electronic device to accomplish each of the acts necessary to commit the offense, including traveling to the agreed upon meeting place at the agreed upon meeting time. We disagree with McKnight's construction of HRS § 707–756(1) because it conflicts with the Legislature's intent and would lead to absurd results, and we conclude that the Circuit Court's jury instruction was not improper.

In construing a statute, " 'our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statutes themselves.' " *State v. Cornelio,* 84 Hawai'i 476, 484, 935 P.2d 1021, 1029 (1997). " '[W]e must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.' " *Id.* "In other words, 'the reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning.' " *Id.* (block quote format and brackets omitted) (quoting HRS § 1–15(2) (2009)). In addition, " 'the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality.' " *Id.; see also* HRS § 1–15(3) (2009) ("Every construction which leads to an absurdity shall be rejected.").

■ "When jury instructions ... are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Nichols,* 111 Hawai'i 327,

334, 141 P.3d 974, 981 (2006) (block quote format and citation omitted).

### 1.

At the time relevant to this case, HRS § 707–756(1) [6] provided in pertinent part as follows:

(1) Any person who, using a computer or any other electronic device:

(a) Intentionally or knowingly communicates:

. . . .

(iii) With another person who represents that person to be under the age of eighteen years; and

(b) With the intent to promote or facilitate the commission of a felony:

(i) That is a murder in the first or second degree;

(ii) That is a class A felony; or

(iii) That is an offense defined in section 846E–1;

agrees to meet with the minor, or with another person who represents that person to be a minor under the age of eighteen years; and

(c) Intentionally or knowingly travels to the agreed upon meeting place at the agreed upon meeting time;

is guilty of electronic enticement of a child in the first degree.

The Circuit Court's instruction on the elements for first-degree electronic enticement of a child provided in relevant part as follows: [7]

In the indictment, defendant Robert McKnight is charged with the offense of electronic enticement of a child in the first degree.

A person commits the offense of electronic enticement of a child in the first degree if he intentionally or knowingly uses a computer or any other electronic device to intentionally or knowingly communicate with another person[,] who rep-

---

**6.** Footnote 3, *supra,* notes the subsequent amendments made to HRS § 707–756(1).

**7.** The quoted instruction is from the transcript of the Circuit Court's oral instructions to the jury.

The punctuation and numerals in brackets and the paragraph formatting is based on the written jury instructions that the record reflects was passed out to the jury.

resents that person to be under the age of 18 years[,] with the intent to promote or facilitate the commission of sexual assault in the first degree or sexual assault in the third degree[,] and intentionally or knowingly agrees to meet with another person who represents that person to be a minor under the age of eighteen years[,] and intentionally or knowingly travels to an agreed-upon meeting place at an agreed-upon meeting time.

There are five material elements of the offense of electronic enticement of a child in the first degree, each of which the prosecution must prove beyond a reasonable doubt.

The five elements are:

■ That on or about the 13th day of June, 2006[,] to and including the 6th day of July, 2006, in the County of Maui, State of Hawaii, defendant intentionally or knowingly used a computer or other electronic device; and

■ [T]hat the defendant intentionally or knowingly used a computer or other electronic device to communicate with another person[,] who represented that person to be under the age of 18 years; and

■ [T]hat the defendant communicated with the other person with the intent to promote or facilitate the commission of sexual assault in the first degree or with the intent to promote or facilitate the commission of sexual assault in the third degree[;] and

■ [T]hat the defendant intentionally or knowingly agreed to meet with another person who represented that person to be under the age of 18 years; and

■ That the defendant intentionally or knowingly traveled to an agreed-upon meeting place at an agreed-upon meeting time.

## 2.

■ McKnight construes HRS § 707–756(1) as requiring the State to prove that he used a computer or other electronic device (1) to communicate with another person who represented that he or she was under eighteen years old; (2) to agree to meet with such person; and (3) to travel to the agreed upon meeting place at the agreed upon meeting time. Based on this construction, he argues that the Circuit Court's jury instruction was erroneous because it did not require the State to prove that he used a computer or other electronic device to agree to meet with "Chyla" or to travel to the agreed upon meeting place.

We reject McKnight's interpretation of the statute because it conflicts with the Legislature's intent and would lead to absurd results. The legislative history of HRS § 707–756 demonstrates that the statute was prompted by the increased opportunity created by the internet for criminal predators to communicate with and commit crimes against children. The Legislature's intent in enacting the statute was to protect children by addressing the relatively new dangers created by the internet and the use of computers to communicate with minors for the purpose of committing crime. The report of the Senate Committee on Health and Human Services accompanying the original enactment of HRS § 707–756 provided as follows:

Your Committee finds that the use of the Internet to entice children into meetings has become widespread. Current laws do not specifically address using computers to communicate with minors for purposes of committing crime. This measure would close that loophole, and would allow sex offenders to be investigated and prosecuted before they commit a kidnapping or other crime. One method of investigation that has been successful in arresting sex offenders before a child is hurt has been sting operations in which the sex offender's intended victim is actually a police officer posing as a minor in chat rooms or E-mail communications. Once the sex offender agrees to meet the child and goes to the meeting place, the offender is arrested. However, the sex offender's defense to attempted sexual assault is often the defense of impossibility because the person posing as a child was not actually a child. Therefore, it is important to criminalize the sex offender's predatory comput-

er behavior, so that the offender can be prosecuted for what the offender has actually done, as opposed to what the offender may have been trying to do.

Sen. Stand. Comm. Rep. No. 2867, in 2002 Senate Journal at 1384. The Conference Committee report accompanying this legislation also provided, in relevant part: "The purpose of this bill is to create new criminal offenses relating ... to electronic enticement of a child. Your Committee on Conference finds that this measure addresses the problem of utilizing computer technology in committing crimes against children." Sen. Conf. Comm. Rep. No. 36, in 2002 Senate Journal at 957.

Given the purpose of HRS § 707–756, construing the statute as requiring proof that the defendant used a computer to travel to the agreed upon meeting place at the agreed upon meeting time would lead to absurd results. A computer is not a mode of transportation and is not typically used, or necessary, for travel to an agreed upon meeting place. McKnight argues that in some circumstances a computer could be "used" by a defendant to travel, such as where the defendant used a computer to purchase an airline ticket over the internet so that the defendant could travel to the arranged meeting place. However, under McKnight's interpretation, if a criminal predator used a computer to communicate with a minor with the intent to facilitate a felony, and then drove or walked to the agreed upon meeting place, without using a computer, the statute would not be violated.

The purpose of the statute is to protect children against criminal predators who use the internet to communicate with children with felonious criminal intent. Consistent with that purpose, the requirement that the defendant travel to the agreed upon meeting place serves to distinguish persons who pose no physical danger to minors and have no intent to commit a felony against minors from those who do pose such a danger and possess such an intent. McKnight's interpretation of the statute would limit its application to atypical situations in which a computer was used by the defendant to travel to the meeting place. We conclude that limiting the statute in this fashion would be ab-

surd and contrary to the Legislature's purpose in enacting the statute.

■ For similar reasons, we reject McKnight's argument that the statute requires proof that a defendant used a computer or electronic device to agree to meet with the minor or one representing to be a minor. The statute is ambiguous regarding whether the phrase "using a computer or any other electronic device" modifies the phrase "agrees to meet with the minor, or with another person [representing] to be a minor under the age of eighteen years" in subsection (b). Given the ultimate purpose of the statute to protect children, we conclude that the Legislature did not intend the statute to require that the agreement to meet be accomplished through the use of the computer or other electronic device. The statute already requires the State to prove that a defendant, "using a computer or any other electronic device," intentionally or knowingly communicated with a minor or person representing to be a minor, with the intent to promote or facilitate one of the specified felonies. A person who engaged in such acts with such intent would pose the same grave danger to children regardless of whether the arrangement to meet was accomplished through the use of a computer or other electronic device, or through some other means. Thus, construing the statute to condition its application on proof that the agreement to meet was arranged through the use of a computer or other electronic device would be unreasonable, illogical, and inconsistent with the Legislature's purpose in enacting the statute.

The Circuit Court's jury instruction was consistent with our interpretation of HRS § 707–756. We therefore conclude that the Circuit Court did not err in instructing the jury on the elements for the charged offense of first-degree electronic enticement of a child.

### C.

■ McKnight's insufficiency of evidence claim is based on his interpretation of HRS § 707–756 as requiring proof that he used a computer or other electronic device to travel

to the agreed upon meeting place. McKnight argues that the State failed to introduce evidence, both before the grand jury and at trial, that he used a computer to travel to the agreed upon meeting place at the Kahului Airport. In light of our determination that HRS § 707–756 does not require proof that a defendant used a computer or other electronic device to travel to the agreed upon meeting place, we conclude that McKnight's insufficiency of evidence claim is without merit.[8]

## II.

We now turn to the State's appeal of the Suppression Order.

## A.

■ The State argues that the Circuit Court erred in concluding that the search warrant was invalid because it had been misdated by the issuing judge and in suppressing the evidence recovered pursuant to the warrant on that basis. We conclude that the misdating of the warrant does not require suppression of the search warrant evidence.

It is undisputed that the search warrant was prepared, submitted, issued, and executed on July 6, 2006, the same day that McKnight was arrested. Although the search warrant was issued on July 6, 2006, it was misdated by the issuing judge as being issued on June 6, 2006.

The Circuit Court concluded that the search warrant was supported by probable cause. However, the Circuit Court further concluded that the misdating of the warrant rendered the warrant facially invalid ten days after June 6, 2006, which was before the warrant was actually issued or executed, and it suppressed evidence recovered pursuant to the warrant. In concluding that the search warrant for McKnight's residence was invalid and in suppressing the evidence obtained through the execution of the warrant, the Circuit Court relied upon this court's prior decision in *Endo*.

## 1.

In *Endo*, a police officer mistakenly typed in the date of April 14, 1992, on a search warrant he submitted for signature to a judge on May 14, 1992. This court concluded that this misdating rendered the warrant invalid since Hawaiʻi Rules of Penal Procedure (HRPP) Rule 41(c) required that the warrant " 'command the officer to search, within a specified period of time not to exceed 10 days[,]' " and the warrant itself commanded the officer to search " 'for a period not to exceed ten (10) days from its issuance[.]' " *Endo*, 83 Hawaiʻi at 89, 92–94, 924 P.2d at 583, 586–88. In upholding the suppression of evidence obtained pursuant to the search warrant, this court stated:

> The cause of a search warrant being facially expired when the search is executed may be the mistake of the officer who applied for it, the judge who signed it, and/or the officer who executed it. Does the Hawaiʻi Constitution excuse any of these mistakes? Balancing the uniqueness of Hawaiʻi's Constitution, the specificity requirements imposed by HRPP Rule 41(c), the desire to motivate the officials who prepare, sign, and execute search warrants not to prepare, sign, and execute facially expired search warrants, and the desire and ability to avoid searches pursuant to facially expired search warrants, against the State's desire to have the judiciary validate searches pursuant to search warrants that are facially expired when the searches are made because the officers who applied for them, the judges who signed them, and/or the officers who executed them made a mistake, we conclude that the Hawaiʻi Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made.

*Id.* at 93–94, 924 P.2d at 587–88 (footnote omitted).

---

8. McKnight's claim that indictment should have been dismissed on insufficiency of evidence grounds is also rendered moot by his subsequent conviction after trial. *See In re Doe,* 102 Hawaiʻi 75, 78, 73 P.3d 29, 32 (2003) ("[A]bsent unusual circumstances, any defects in a pretrial determination of probable cause are rendered moot, or are without any effective remedy, which is much the same thing, by a subsequent conviction[.]" (footnote omitted)).

In support of our analysis, we cited *State v. Lopez,* 78 Hawai'i 433, 896 P.2d 889 (1995). In *Lopez,* the Hawai'i Supreme Court declined to adopt the United States Supreme Court decision in *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), which held that the concept of apparent authority applied to a warrantless search based on consent. In *Rodriguez,* 497 U.S. at 179, 185–89, 110 S.Ct. 2793, the United States Supreme Court determined that a warrantless search was valid when based on the consent of a third party whom the police reasonably believed had authority to consent to the search, but who in fact lacked actual authority to consent.[9]

Relying on the greater protection of individual privacy rights afforded under the Hawai'i Constitution than the United States Constitution, the Hawai'i Supreme Court rejected the apparent authority doctrine and held that actual rather than apparent authority to consent to search is required for a third party's consent to be valid. *Lopez,* 78 Hawai'i at 445–47, 896 P.2d at 901–03. The Hawai'i Supreme Court reasoned that "regardless of whether the police acted in good faith, the individual's 'privacy' is still invaded when the police search his or her personal belongings without permission." *Id.* at 446, 896 P.2d at 902. The Hawai'i Supreme Court concluded that

> [a]lthough we acknowledge that the Hawai'i exclusionary rule serves the valuable purpose of deterring governmental officials from circumventing the protections afforded by the Hawai'i Constitution, we now pronounce that an equally valuable purpose of the exclusionary rule under article I, section 7 [of the Hawai'i Constitution], is to protect the privacy rights of our citizens.

*Id.* (citation omitted).

### 2.

■ *Lopez* makes clear that evidence obtained pursuant to a search is subject to suppression under the Hawai'i exclusionary rule where the suppression of the evidence would serve to deter governmental misconduct or protect the privacy rights of our citizens. In this case, however, neither of these articulated purposes for the Hawai'i exclusionary rule would be furthered by suppressing the evidence seized pursuant to the search warrant. There is irrefutable evidence that the search warrant prepared by Agent Domingo was signed by the issuing judge on July 6, 2006, but that the judge misdated the warrant as being issued on June 6, 2006. The warrant was supported by probable cause. In other words, except for the judge's obvious clerical error in misdating the search warrant, there would be no basis for invalidating the warrant or suppressing the evidence seized.

Physical evidence recovered pursuant to a search warrant is generally highly reliable and probative. The exclusionary rule imposes a significant and weighty cost on the judicial process and society by requiring the courts to ignore reliable and trustworthy evidence that has a direct bearing on a defendant's guilt. Where exclusion of the evidence is necessary to further other significant interests, such as deterring government misconduct or protecting privacy rights, the application of the exclusionary rule is justifiable.

In this case, however, there was no governmental misconduct. Agent Domingo properly prepared a search warrant supported by probable cause, which he submitted to a judge for approval. Thus, suppression of the search warrant evidence would not serve to deter law enforcement or governmental misconduct. The suppression of the search warrant evidence would also not serve to protect the privacy rights of our citizens. Except for the clerical error by the issuing judge in the misdating of the warrant, the governmental agents had clearly established their entitlement to search McKnight's residence. Thus, suppression of the search warrant evidence under the circumstances of this case would only serve to benefit those who were validly subject to search, but by pure fortuity happened to

---

9. The particular circumstances involved in *Rodriguez* was a third party's consent to the warrantless entry by the police of the defendant's residence. *Rodriguez,* 497 U.S. at 179–80, 110 S.Ct. 2793.

342

draw an issuing judge who made a clerical error in signing the warrant.

Courts from other jurisdictions have concluded that a clerical or scrivener's error does not justify invalidating the warrant and suppressing evidence obtained pursuant to the warrant. *E.g., State v. Dalton,* 132 Or. App. 36, 887 P.2d 379 (1994); *State v. Steffes,* 269 Mont. 214, 887 P.2d 1196, 1210 (1994).

Under the circumstances of this case—where a government agent obtains a search warrant supported by probable cause, the only basis for challenging the warrant is its being misdated by the issuing judge, and the actual date of issuance can be established by irrefutable evidence—we conclude that no valid purpose would be served by suppressing the search warrant evidence. We overrule *Endo* to the extent that it is inconsistent with our analysis in this case.

### B.

 The State argues that the Circuit Court erred in concluding that McKnight did not voluntarily, knowingly, and intelligently waive his *Miranda* rights and in suppressing his recorded statement to Agent Domingo on that basis.[10] We agree.

 The appellate courts answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard. Accordingly, we review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right or 'wrong.' "

*State v. Wallace,* 105 Hawai'i 131, 137, 94 P.3d 1275, 1281 (2004) (internal citations, quotations, brackets, and ellipsis points omitted).

 In addition,

**10.** We note that the Circuit Court also concluded that Agent Domingo violated HRS § 803–9(2) and (4) (1993) by failing to make "reasonable efforts" to contact an attorney or McKnight's mother after McKnight's requests, but that the statutory violations did not warrant suppression of McKnight's statement because McKnight failed to meet his burden of showing a causal

"waiver is a question that requires application of constitutional principles to the facts as found." Accomplishment of this task "requires us to examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of circumstances surrounding the defendant's statement." Thus, we apply a de *novo* standard of appellate review to the ultimate issue of the voluntariness of a confession.

*(State v. Henderson,* 80 Hawai'i 439, 441, 911 P.2d 74, 76 (1996) citations and brackets omitted).

The Circuit Court concluded that McKnight had not validly waived his *Miranda* rights because under the circumstances, McKnight had not initiated the discussion with Agent Domingo following McKnight's exercise of his *Miranda* rights to an attorney. Among the circumstances cited by the Circuit Court were: (1) Agent Domingo's re-entering the room with the intention of questioning McKnight and without having made an effort to contact an attorney; (2) Agent Domingo's disregarding McKnight's request to call his mother; and (3) Agent Domingo's statement, in response to McKnight's question of what was going to happen next, that the agents were going to execute a search warrant, which the Circuit Court concluded was reasonably likely to elicit an incriminating response. As discussed below, we hold that the Circuit Court erred in concluding that McKnight had not initiated the discussion with Agent Domingo and had not validly waived his *Miranda* rights.

 In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that an accused who "expresse[s] his desire to deal with the police only through counsel, is not subject to further interrogation by the

connection between the statutory violations and his statement. *See State v. Edwards,* 96 Hawai'i 224, 239–40, 30 P.3d 238, 253–54 (2001); *State v. Ababa,* 101 Hawai'i 209, 217–18, 65 P.3d 156, 164–65 (2003). McKnight does not dispute or contest the Circuit Court's ruling that the statutory violations did not warrant suppression of his statement, and we do not address this issue.

authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Id.* at 484–85, 101 S.Ct. 1880 (emphasis added). After a defendant initiates communication, the police may interrogate the defendant as long as the waiver of counsel was "knowing and intelligent and found to be so under the totality of the circumstances, including the *necessary fact that the accused, not the police, reopened the dialogue with the authorities.*" *Id.* at 486 n. 9, 101 S.Ct. 1880 (emphasis added).

The Hawai'i Supreme Court has cited and applied the principles set forth in *Edwards v. Arizona. See Henderson,* 80 Hawai'i at 441–42, 911 P.2d at 76–77 (1996) (concluding that the defendant's *Miranda* waiver was valid when he initiated dialogue after initially refusing to sign a waiver of his rights); *see also State v. Hoey,* 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994) (concluding that if upon a non-substantive clarification of an equivocal request for counsel, the defendant voluntarily, knowingly, and intelligently waives the presence of counsel, then substantive questioning may continue).

Here, the undisputed evidence shows that after initially requesting an attorney, McKnight asked to call his mother, and when Agent Domingo denied that request, McKnight asked Agent Domingo what was going to happen next. By asking Agent Domingo what was going to happen next, McKnight initiated "further communication, exchanges, or conversations with [Agent Domingo,]" thereby authorizing Agent Domingo to revisit whether McKnight would be willing to waive his *Miranda* rights. *See Edwards v. Arizona,* 451 U.S. at 485, 101 S.Ct. 1880; *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (holding that a defendant initiated further conversation with police within the meaning of *Edwards v. Arizona* by asking, "Well, what is going to happen to me now?" because this question "evinced a willingness and a desire for a generalized discussion about the investigation").

The circumstances cited by the Circuit Court do not support its conclusion that McKnight did not initiate communication with Agent Domingo. The fact that Agent Domingo re-entered the interrogation room with the intent to ask McKnight questions about his residence has no bearing on whether McKnight initiated communication with Agent Domingo. Regardless of Agent Domingo's intent, it was McKnight who spoke first. Agent Domingo's undisclosed subjective intent to further question McKnight cannot serve to negate McKnight's act of initiating communication with Agent Domingo.

The same is true of Agent Domingo's failure to contact an attorney for McKnight before re-entering the room and Agent Domingo's denial of McKnight's request to contact his mother. The record indicates that only a short time elapsed between the time Agent Domingo exited the interview room and when he re-entered. The failure of Agent Domingo to immediately contact an attorney for McKnight and the denial of McKnight's request to call his mother does not detract from McKnight's having initiated communication with Agent Domingo.

Agent Domingo's response to McKnight's question about what was going to happen next occurred after McKnight had already initiated conversation with Agent Domingo. Thus, Agent Domingo's response does not provide a basis for concluding that McKnight did not initiate communication with Agent Domingo.

Our review of the record shows that after McKnight initiated communication with Agent Domingo, McKnight voluntarily, knowingly, and intelligently waived his *Miranda* rights. Upon McKnight's advising Agent Domingo that McKnight had changed his mind and wanted to give a statement, Agent Domingo made clear to McKnight that Agent Domingo was making no promises and that it was strictly up to McKnight concerning what he wanted to do. Agent Domingo also represented and reviewed with McKnight an advice-of-constitutional-rights form, which McKnight signed, thereby signifying the waiver of his rights, including his right to an attorney. In addition, during the recorded interview, McKnight acknowledged that he was making the statement of his own freewill, without any force, promises, threats, or coercion by Agent Domingo.

## CONCLUSION

For the foregoing reasons, we: (1) affirm the Circuit Court's Judgment with respect to the conviction and sentence for first-degree electronic enticement of a child charged in Count 1; (2) vacate the Circuit Court's Suppression Order; and (3) remand the case for further proceedings consistent with this Opinion.